## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-02483-LTB-KLM

OMAR REZAQ,

     Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,
et al.,

     Defendants.

---

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

     Plaintiff, Omar Rezaq, by and through counsel, respectfully submits his Response to

Defendants' Motion for Summary Judgment (Doc. 112) as follows:

## I.  INTRODUCTION

     Following his conviction for air piracy in 1996, Omar Rezaq was originally designated to

USP Leavenworth ("LVN"), a maximum security prison in the Federal Bureau of Prisons

("BOP").  After approximately six weeks at LVN, Mr. Rezaq was transferred, without notice or

an opportunity to be heard, to the federal "supermaximum" security prison ("ADX") where

inmates are housed in solitary confinement under the most restrictive conditions in the BOP.  In

this lawsuit, Mr. Rezaq asserts that he has a liberty interest in his conditions of confinement at

the ADX and challenges the process for safeguarding that interest. [1]

Since February 1998, Mr. Rezaq has been eligible for placement in the ADX Step-Down Program, the vehicle by which prisoners are able to ultimately transfer out of the ADX to a less restrictive (but still maximum security) prison.  However, Mr. Rezaq was repeatedly denied admission to the Step-Down Program until three months ago -- after the inception of this litigation and ten weeks before the dispositive motion deadline.  The notices denying Mr. Rezaq admission to the Step-Down Program recite only vague, boilerplate reasons for the denials, providing him no guidance on how he could alter his behavior or respond to the "evidence" against him.

Similarly, because the Step-Down review notices were provided to Mr. Rezaq only *after* the denial decisions were made, Mr. Rezaq had no opportunity to be heard by the Step-Down Committee ("the Committee").  Notably, even when the Committee recommended in favor of admitting Mr. Rezaq to the Step-Down Program ("Step-Down"), he was repeatedly denied admission by the Warden without explanation to either Mr. Rezaq or the Committee.  The ADX warden has ultimate discretion to admit or deny inmates access to Step-Down, for any reason or no reason at all, even when that decision is contrary to the Committee's recommendation.

---

[1] Three additional claims were dismissed early in the litigation, one of which was a due process claim challenging Mr. Rezaq's transfer to the ADX. The transfer claim was dismissed due to the statute of limitations. However, to the extent that the circumstances of Mr. Rezaq's initial transfer are relevant to the surviving claim, this Court merged the two issues for limited purposes. (Doc. 57 at 9.)

Additionally, in December 2009, thirteen years after he was brought to the ADX, Defendants purported to hold a hearing to determine whether Mr. Rezaq was appropriate for transfer to the ADX. (Doc. 112, Ex. 1-3, E. Alexander Decl. at ¶ 7.)  Plaintiff contends that by conducting this hearing, Defendants have engaged in new conduct that supports Mr. Rezaq's claim that Defendants violated his right to due process regarding his transfer to ADX, as pled in Claim 1(a) of Plaintiff's First Amended Complaint (Doc. 19).  On that basis, Plaintiff has filed a Motion to Reinstate Claim 1(a) of Plaintiff' First Amended Complaint, Or, In the Alternative, To File a Supplemental Pleading.  (*See* Doc. 121.)

On September 29, 2009, Mr. Rezaq was admitted and transferred to the first phase of Step-Down when newly installed Warden Davis affirmed the recommendation of the Committee. Consequently, Defendants argue that Plaintiff's claim is now moot because there is no relief that this Court can grant.  However, Mr. Rezaq's surviving claim requests relief of transfer to a less-restrictive facility or, at least, participation in the ADX's Step-Down Program such that he is ultimately transferred out of ADX.  Accordingly, Plaintiff's claim is not, and cannot be moot as he still has an active cognizable interest in the outcome.  Mere admission to the first phase of Step-Down did not satisfy either Mr. Rezaq's request to fully participate in this program, or his request for transfer elsewhere.

Alternatively, even if the Court were to determine that the move to the first phase of Step-Down mooted Mr. Rezaq's claim, the doctrine of voluntary cessation counsels against a finding of mootness.  Although the BOP has granted Mr. Rezaq admission to the first phase of Step-Down, Defendants' decision to admit him to the program without any change in his conduct or circumstance, with no guarantee of continued progression through the program, and with the ability to return him to ADX GP at any time for any reason, falls squarely within the voluntary cessation exception to the mootness doctrine.  Indeed, going forward, Mr. Rezaq will be reviewed by the Step-Down Committee for progression through each phase of the program and for potential removal back to ADX general population ("GP"), where the review process for admission begins all over again.  Moreover, the ADX Warden maintains the same level of discretion for progression through, and removal from, Step-Down as with the initial admission determination.  Consequently, Mr. Rezaq is operating without any assurance that his continued clear conduct and compliance with behavioral expectations will result in his successful

3

progression to a less-restrictive facility, and instead remains at risk for being returned to an ADX GP-Unit at any time.

Finally, although Defendants urge that the narrowest relief required by the PLRA is Mr. Rezaq's admission to Step-Down, injunctive relief involving his transfer to less-restrictive facility is, in fact, the narrowest relief available. As outlined above, a number of material facts are clearly in dispute and Plaintiff's claim is neither moot nor barred by the PLRA. Accordingly, Defendants' Motion for Summary Judgment should be denied.

## II.  PROCEDURAL HISTORY

Defendants correctly describe the procedural history of this case in their Motion for Summary Judgment. However, as a clarification, Plaintiff notes that although the challenge to Mr. Rezaq's transfer was dismissed as its own claim, the circumstances of the transfer were preserved to the extent they are relevant to Mr. Rezaq's ongoing detention and Step-Down participation. (Doc. 57 at 9.) In dismissing the transfer claim, this Court specifically found the transfer relevant to Mr. Rezaq's Step-Down claim due to multiple Step-Down denial notices citing to his "failure to mitigate [his] original reasons for placement at the ADX." (*Id.* at 18.) Because Mr. Rezaq was not informed of the reasons for his placement at ADX, he did not know how to mitigate them for Step-Down admission. Consequently, his placement continues to affect the sufficiency of process under his surviving claim. *Id.*

## III. PLAINTIFF'S STATEMENT OF FACTS

On pages 6 through 29 of their Motion for Summary Judgment, Defendants list 160 "Undisputed Facts." While some of those statements are undisputed by Plaintiff; others are disputed as misleading, conclusory, inaccurate or unfounded. Plaintiff hereby addresses the

4

statements in the sequential order used by Defendants and provides additional facts where

necessary to provide a complete record for the Court.

### A. Mr. Rezaq's U.S. Conviction is For the Same Conduct as his Malta Conviction

(1-3):  Undisputed.

Plaintiff's Additional Facts:

a)  Mr. Rezaq is 51 years old and has expressed deep remorse for his crime:

"[THE WITNESS:]  I feel remorse in my heart, you know.  And I take decision at that time.  I cut all my relation with my organization at that time.  I cut, period.  I don't try it.  I don't make no phone -- I make nothing.  And this is why, because I feel what I did is -- give me a second.  MS. ROVNER:  Do you need a minute?"

(Ex. 1, Rezaq Dep. and ammendments 139:16-21, Oct. 9, 2009.)

b)  Mr. Rezaq was originally tried and convicted in Malta for crimes arising out of the

same events as his current U.S. crime of conviction.  (Ex. 3, Rezaq Decl., Jan. 10, 2010, at ¶ 32.)

In the Maltese prison he was able to interact freely with staff and inmates. (Ex. 3 ¶ 2.)  He was

out of his cell daily and worked for approximately four years in the metal shop and bookbinding

shop.  (*Id.*)  In the open population he ate meals with the inmates in his unit and moved freely

throughout the facility during the day.  (Ex. 1 at 19:7-8; Ex. 3 ¶ 2.)  During seven years in the

Maltese prison, he maintained good relationships with staff and inmates, and completed his

sentence without incident.  (Doc. 19, 1st Am. Compl. at 3 ¶ 10-11; Ex. 3 ¶¶ 1, 3.)  In fact, the

Maltese Director of Prisons testified to Mr. Rezaq's good character at his U.S. criminal trial. (Ex.

3 ¶ 4; Ex. 4, Rezaq Criminal Trial, Test. of J. Camilleri, at 2-5, 22-26.)

c)      Mr. Rezaq was later confined for almost four years in the Central Detention

Facility in Washington, D.C. while awaiting sentencing and designation.  (Doc. 19 at 3-4, ¶¶ 15,

18; Ex. 3 ¶ 5.)  At the D.C. facility, Mr. Rezaq was housed in a unit with 60 other inmates in an

open population in which was able to interact with inmates and staff on a daily basis and free to leave his cell for 12 hours per day.  (Ex. 3 ¶ 6.)  Although there was a lot of fighting among inmates, Mr. Rezaq served his years in the D.C. jail without incident and maintained positive relationships with inmates and staff and held employment as an orderly, which permitted him additional out-of-cell time.  (*Id.* at ¶ 5-7.)

### B. Mr. Rezaq's Background

(5-6):  Undisputed.

Plaintiff's Additional Facts:

d)      In approximately 1968, Mr. Rezaq's family was forced to relocate from the West Bank to a United Nations refugee camp in Jordan, which housed between 10,000 and 15,000 families.   Mr. Rezaq lived at the camp until about 1973.  (Ex. 1 8:7-18, 9:1-8.)

e)      The schools in the camp were run by the United Nations.  Nearly all of the teachers at that school were members of the PLO.   (*Id.* at 9:10-17.)

f)      Life in the camp was a "miserable" one.  (*Id.* at 9:10-12.)

7.      Disputed. Mr. Rezaq does see a difference between Israeli citizens and Israeli military, as he distinguishes fighting against citizens and fighting a government and its policies. (Ex. 1 at 76:23-77:4.)  He does admit that all Israeli citizens are required to serve in the military, as contrasted with a civilian-soldier distinction in countries like the United States. (*See* Ex. 1 15:6-21.) Mr. Rezaq does not believe all Israelis were in conflict with Palestine, stating: "I don't say that. This is what I tell you *they* say, what their -- what they teach their students, what they talk, what they try to make their ideology." (Ex. 1 at 76:1-12.)

8.      Partially Disputed. Mr. Rezaq received only basic training. (Ex. 1 at 20:2-8, 26:16-25.)

9.      Partially Disputed.  Mr. Rezaq left the Jordanian Army after six or seven months because he was "treated badly by the [Jordanian] soldiers" due to discrimination against Palestinian draftees.  (Ex. 1 at 20:15–22:17.)  Mr. Rezaq only joined the PLO following his recruitment by a friend, a decision he described as "young and foolish."  (*Id.* at 21:4-5.)

(10-16).      Undisputed.  However, Plaintiff notes that other individuals with materially similar training are housed in other institutions throughout the BOP.  (Ex. 5, Smith Expert Dep. at 44:4-5; 81:13-82:1, Aug. 21, 2009.)

17.      Partially Disputed.  Mr. Rezaq resigned from the Fatah Revolutionary Council ("FRC") because he was lonely:  "You don't see human being, you know.  You isolation; you cut from the outside world.  You don't know what's outside the camp there, you know."  (Ex. 1 at 34:16-19.)  Since Mr. Rezaq *did* have the option of leaving he felt inclined to take it.  (*Id.* at 35:1-6.)

Plaintiff's Additional Fact (g):  After Mr. Rezaq resigned from the FRC, he went into construction work in Iraq until a member of the PLO convinced him to go to Lebanon and join the PLO there, offering him financial incentive to do so.  (Ex. 1 at 35:8-23.)

18. Partially disputed.  Mr. Rezaq "went [to the Beirut camp] for supposed the training for three months.  But it is most talking, you know.  They don't have that organized camp…"  (*Id.* at 36:19-21.)

(19–21.)  Undisputed.

22.      Partially Disputed.  The fighting lasted "probably few weeks only," and Mr. Rezaq also notes that he did not kill anyone during the fighting.  (Ex. 1 at 40:21-22, 41:9-11.)

23.      Undisputed.

24.      Partially Disputed.  Mr. Rezaq characterized his involvement in the dispute with the

Falange as working at a "stationed post:" he was not a part of an attack of any kind.  (Ex. 1 at 52:1-9, 52:21–53:13.)

25.    Undisputed.

26.    Partially Disputed.  Mr. Rezaq's residence at the Baka Valley camp was not optional.  (*See* Ex. 1 at 54:8-25.)  In fact, Mr. Rezaq testified that this period was more like an internment, in which he was kept in isolation and the individuals there were not allowed to interact or speak with each other for fear of investigation and retribution. (Ex. 1 at 56:1-57:22.)

Plaintiff's Additional Fact (h): Mr. Rezaq's shifting membership in various groups was due to multiple factors, including proximity to his family.  (Ex. 3 ¶ 11.) Mr. Rezaq *primarily* participated in PLO-affiliated organizations because he felt, as many Palestinians at the time also believed, that membership to *some* group could provide safety and security.  (Ex. 3 ¶ 11; Ex. 1 at 43:16–44:11, 44:23–45:6.)  Though he was taught from an early age to participate in the Palestinian struggle, he did not conform to any singular approach to reaching this goal.  (*Id.*; Ex. 1 44:23–45:6.)  Due to his young age, he felt directionless and wandering, such that he moved from group to group trying to find a "fit," where regional solidarity created social divisions and group membership constituted your home and only personal connections.  (Ex. 3 ¶ 11-12.)

**C.    The Events of Mr. Rezaq's Crime of Conviction Occurred in 1985.**

Plaintiff's Additional Fact (i):  The events of November 23, 1985, constitute Mr. Rezaq's only criminal history.  (Ex. 3 ¶ 32.)

27.    Undisputed.

28.    Partially Disputed.  Mr. Rezaq was ordered to go to Beirut, and then Athens, without having any knowledge of why he was sent there. (Ex. 1 at 58:23–59:17.)  He stayed alone in a

room in Athens for "one week or ten days," (*Id.* at 59:17–60:10), before a member of the FRC

leadership informed him of his mission.  (*Id.* at 60:23–61:4.)  During that time, Mr. Rezaq feared

for his life should he attempt to flee or refuse to follow orders.  (*Id.* at 63:16 – 64:16.)

(29-30).     Undisputed.

31.     Disputed. Mr. Rezaq's mental state was altered by his superiors to ensure he would

complete the mission and used "mentally prepared" to mean something akin to brainwashing.

(Ex. 1 at 91:20–92:2, 145:12–146:14.)  He was kept in total isolation in Athens for 10 days, in

addition to the previous months he spent sequestered at the Baka Valley camp and given pills to

keep him awake for three days preceding the crime.  (Ex. 1 at 148:5–149:9.)  By the day of the

mission, Mr. Rezaq had not slept in three days, was highly medicated, and was in a state of

delirium, (*id.* at 149:10-18), which he described as, "not in my mental state like normal human

being."  (Ex. 1 at 91:20–92:2.) Mr. Rezaq testified that once he recovered from the effects of this

preparation after a few months in the Malta prison, he "start[ed] to 'wake up'" and was able to

think clearly for the first time in many months, "[b]ecause the first time in my life I feel myself

free, you know; nobody in my head."  (Ex. 1 at 139:2-15.)  Mr. Rezaq chose then to cut off all

ties with his previous organizations and has never been in contact with them since.  (Ex. 3 ¶ 12;

Ex. 1 at 139:16-22.)

(32-34).     Undisputed.

Plaintiff's Additional Fact (j): Mr. Rezaq did not bring any weapons through airport security.

(Ex. 1 at 67:25–68:5.)

(35–42.)     Undisputed.

Plaintiff's Additional Fact (k):  Once the Egyptian army set fire to the plane, Mr. Rezaq helped

the remaining passengers to pry open the door, and then assisted each of them out of the plane. (Ex. 1 at 88:14–89:2.)  While he was assisting them, he was shot in the shoulder and briefly blacked out.  (*Id.* at 89:2-5.)

43.    Undisputed.

### D.  There is No Documentary Evidence of Any BOP Review Prior to Mr. Rezaq's Transfer to the ADX[2]

44.    Undisputed.

Plaintiff's Additional Fact (l): Mr. Rezaq received no notice or explanation of his transfer to the ADX from LVN, (Ex. 1 at 151:4-14), and there is no evidence that Mr. Rezaq's conduct while incarcerated reflected an inability to function in that facility. (*See* Ex. 6, Smith Fact Dep. 12:5-13:22, Aug. 21, 2009; Ex. 7, Fox 30(b)(6) Dep. 9:2-13, Oct. 13, 2009; Ex. 8, Fox Fact Dep. 129:18-19, 141:24-142:22, Oct. 13, 2009.)  In fact, Mr. Rezaq's entire detention history for over ten years prior to his arrival at LVN was without a single incident in general population settings. (*Id.*; Ex. 3 ¶¶ 1, 5.)  During his tenure at the ADX, from 1997-2005 specifically, Mr. Rezaq also had open recreation with other inmates and also had no issues during that time.  (Ex. 1 at 124:7–125:20.)  Mr. Rezaq's only interaction with LVN staff that may relate to his transfer was an inquiry by the Captain regarding his ethnic background as a Muslim Arab and expressing opposition to housing Mr. Rezaq at LVN.  (Ex. 1 at 151:4-14.)  His transfer occurred shortly thereafter.  (*Id.*)

45.    Disputed. Mr. Rezaq reasons that his ADX placement has some bearing on the parole board's determination. He believes that his ongoing placement at the highest level of security in

---

[2] Plaintiff notes that the details of his transfer to the ADX are only relevant to his Step-Down claim to the extent that his transfer continues to affect his Step-Down participation and transfer out of the ADX.

the BOP signals to the parole board that an individual is not prepared to re-enter society.  (Ex. 3 ¶ 30.)

46.     Partially Disputed.  The NCRO designated Mr. Rezaq to LVN post-sentencing, when all relevant information was already before them.  (*See* Doc. 112, Def's Mot. for Summ. J., Ex. A-2, Collins Decl. ¶ 7.)  The NCRO's determination occurred *prior to* his transfer to LVN from the District of Columbia facility where he was housed for four years pending his conviction. (*See* Doc. 112, Ex. A-2, Collins Decl. ¶ 7; Ex. 3 ¶ 5.)  Therefore no new information was relied upon to justify his subsequent transfer to the ADX.

47.     Undisputed.

(48–50.)     Disputed.  Plaintiff disputes all factual allegations regarding the reviews of his transfer to the ADX since all documentary evidence of these reviews was destroyed by Defendants three years after the transfer occurred.  (*See* Doc. 112 at 13 ¶ 58.)  Plaintiff was unable to depose Laura Mason (Defendants' 30(b)(6) designee) due to her unavailability during the discovery period, and was therefore unable, to identify *how* she may be familiar with the details of Mr. Rezaq's transfer occurring thirteen years ago.  Neither does her declaration submitted by Defendants provide any basis for her familiarity with Mr. Rezaq or his designation process beyond her "access to Bureau records," since those relating specifically to *Mr. Rezaq's* designation have been destroyed.  (*See* Doc. 112 Ex. A-4, Mason Decl. ¶ 3.)

51.     Undisputed.

52.     Partially Disputed.  Although Warden True did note these characteristics, there is absolutely no evidence that Mr. Rezaq has ever obtained bomb manufacture skills.

53.     Undisputed.

(54–55.)        Disputed.  As with facts 48-50, Plaintiff disputes all factual allegations regarding

the reviews of his transfer to ADX since all the documentary evidence of these reviews was

destroyed three years after the transfer occurred.  (*See* Doc. 112, at 13 ¶ 58.)  Plaintiff has never

been shown any "referral packet" that may have been reviewed by the NCRO in Mr. Rezaq's

case, and cannot know whether such packet did in fact undergo review through the proper

channels.

(56–57.)        Undisputed.

58.        Undisputed.  Although Plaintiff cannot independently verify the truth of this statement,

since Defendants did not identify or produce such documents during discovery, he does not

dispute that Defendants destroyed the documents in good faith.

59.        Undisputed.

### E.  BOP Review Subsequent to Mr. Rezaq's Transfer to the ADX

60.        Disputed.  None of these listed events—Classification, Program Reviews, or Progress

Reports—provide Mr. Rezaq with a meaningful review of his housing placement.  The Program

Reviews are bi-annual and generally cover an inmate's "progress in recommended programs."

(Ex. 9, *Program Statement 5322.12 regarding Classification and Program Reviews*, at 5; *see*

*also* Ex. 3 ¶ 18.)  Classification is conducted annually, and updates the inmate's custody and

security "scores."  (Ex. 10, *Program Statement 5100.08, Custody Classification Form*

*Instructions*, ch. 6 at 1))   Any review by the inmate regarding the Program Reviews and/or

Classification "reviews" occur concurrently at the team meeting.  (*See* Ex. 9 at 4.). The Progress

Reports occur only once every three years and include a review of "the inmate's adjustment

during confinement, program participation and readiness for release."  (Ex. 11, *Program*

*Statement 5803.07 re: Progress Reports*, at 1.)  Neither the Program Reviews, nor the Progress

Reports, purport to review Mr. Rezaq's housing placement, including whether he is moved to

Step-Down, as the staff at these reviews do not consider housing issues and do not have the

power to alter – or even recommend altering – this housing status.  (Ex. 9, at 5; Ex. 10, ch. 6, at

1, 4; Ex. 11, at 1.  *See also* Ex. 3 ¶¶ 18-19.)

61.     Disputed.   Any individualized scoring that occurs at Mr. Rezaq's classification is

meaningless, as he has an "exception" applied to him that "indefinitely" requires his security

score to be classified as "high security."  (Ex, 14. *Request for Indefinite Greater Security

Variable*, US00202.)  Thus, regardless of any positive behavior, programming, or other relevant

factors that lower his score, it is impossible for him to receive anything other than a "high

security" label.  His scored points give him a classification of "medium."  (Ex. 12, Rezaq

*Custody Classification Form*, May 21, 2007, US00203.)  Placement in a "medium" security BOP

facility would allow him access to "a wide variety of work and treatment programs" not

available to him at ADX.  (Ex. 13, *BOP Website Information on Prison Types*).

62.     Disputed.   Team meetings occur approximately every six months and last two or three

minutes.  Sometimes they are not held at all. (Ex. 3 ¶ 18.)  Sometimes, in lieu of a meeting, Mr.

Rezaq merely signs whatever paperwork is provided to him by his case manager or counselor.

(Ex. 3 ¶ 18.)  While Mr. Rezaq can raise questions about his housing at these meeting, the unit

team has no ability to change his housing or Step-Down status.  (Ex. 3 ¶ 18.)  When Mr. Rezaq

has broached Step-Down in team meetings he is told that the unit team is powerless to address

his concerns and to just keep doing what he's doing.  (Ex. 3 ¶ 19.)

63.     Disputed. Classification entails updating a form with basic information regarding the

inmate.  (Ex. 12.)  No matter how well the inmate behaves or how low of a score he receives, Mr. Rezaq's placement at ADX itself automatically renders his security level as "high."  (Ex. 14, "Request for Transfer of Management Variable," May 4, 2005, at US00202.)

64. Disputed.  Mr. Rezaq never had a classification team meeting during his time at Leavenworth ("LVN").  (Ex. 3 ¶ 17.)

65.)    Partially disputed.  These reviews do not reflect or address the needs of the inmate. Sometimes these "reviews" consist of Mr. Rezaq merely signing his paperwork in lieu of a meeting.  (Ex. 3 ¶¶ 18-19.)

66.    Disputed.  Mr. Rezaq did not have a classification meeting at LVN.  (Ex. 1 at 151:4-15; Ex. 3 ¶ 17.) The only meeting Mr. Rezaq had was when LVN's Captain stopped by his cell and asked him if he was Arab-Muslim.  After Mr. Rezaq responded affirmatively, the Captain told him that he did not want Mr. Rezaq at the facility.  (Ex. 1 at 151:4-15; Ex. 3 ¶ 9.)  He was also denied recreation during that time at LVN.  (Ex. 1 at 137:16-22.)

67.    Disputed. The Program Reviews and Classification are not "identical in format."  These reviews occur at the same meeting, both happening within a few minutes.  (*See* Ex. 9 at 4.)

68.    Partially disputed.  Mr. Rezaq did not receive a Program Review at LVN. (Ex. 3 ¶ 17.)

69.    Partially disputed.  Inmates can ask questions about their housing; however, the unit team cannot impact their housing or placement into the Step-Down program.  (Ex. 3 at ¶¶ 18-19.)

70.    Undisputed.

71.    Partially Disputed.  Though Plaintiff has requested the entirety of his BOP Central File in discovery, he has not received copies of the Program Review Reports.

72.    Undisputed.

73.     Partially Disputed.  Plaintiff has in fact taken every opportunity provided to raise his concerns, however, he has received only unresponsive or minimally responsive answers to those concerns, often only peripherally addressing the issue originally raised. (Ex. 3 ¶¶ 18-19; Ex. 1 at 118:3-122:15.)

74.     Undisputed.

75.     Partially disputed.  All educational programming occurs through the television and Mr. Rezaq has never had in-person instruction.  (Ex. 3 ¶ 16(e).)

76.     Partially disputed.  Plaintiff disputes that punctuality is considered by staff in preparing his progress reports as he has no control over his punctuality and only leaves his cell when removed by ADX staff. (Ex. 3 ¶ 21.)

77.     Undisputed.

**F.  BOP's New Hearing Process Regarding Inmates Already Transferred to the ADX Was Instated in September 2009, Thirteen Years After Mr. Rezaq's Transfer**

(78-86.)     Undisputed.

87.     Partially Disputed.  The factual basis regarding his crime of conviction was already part of the decision to designate him to LVN initially, and the only other factual basis provided was for conduct that occurred *after* his transfer to the ADX and could therefore have no bearing on the original decision to transfer him *to* the ADX.  (Ex. 15, Rezaq Hearing Notice, Dec. 2, 2009, at 1-2; Ex. 8 73:6-16, 87:17-88:13.)

88.     Partially Disputed.  The reason for Plaintiff's refusal was not documented in the record. Mr. Rezaq's refusal was based the BOP's refusal to grant his repeated request to consult with counsel prior to having the hearing.  He did *not* make a blanket refusal to participate.  (Ex. 3 ¶ 26-29; Ex. 16, Rezaq Post-Hearing Report at US02862.)  Mr. Rezaq feared participating in the

hearing without being able to consult with his counsel, as he was concerned that statements he made at this hearing, albeit thirteen years too late, could have some bearing on his pending litigation. (Ex. 3 ¶ 26.)  The Hearing Administrator denied his request and classified his request as a "refusal" to participate.  (Ex. 3 ¶ 27; Ex. 16 at US02862.)

(89–90.)　　　Undisputed.

91.　　Partially Disputed. Plaintiff disputes that "all information" is included in the written recommendation.  His request for counsel was not documented in the recommendation.

(92–96.)　　　Undisputed.

### G.  Mr. Rezaq's Post Hoc Transfer Hearing Under "New Procedures" Occurred Thirteen Years After His Transfer

97.　　Disputed.  Plaintiff notes that as of September 18, 2009, counsel for Defendants informed Plaintiff that "[o]ver the past week, the BOP has provided all inmates transferred to the ADX before January 1, 2008, including Mr. Rezaq, with a due process hearing regarding their transfer to the ADX."  (Ex. 17, E-mail Correspondence with A.U.S.A. J. Villaseñor, Sep. 16-18, 2009.) Although counsel for Defendants was misinformed as to *Mr. Rezaq's* receipt of a hearing at that time, many inmates did in fact receive hearings as early as mid-September.  (*Id.*)  It remains unclear why Mr. Rezaq was not among that round of inmates.

98.　　Undisputed.

99.　　Partially Disputed.  Plaintiff disputes that a "multi-level review" actually took place, and this cannot be confirmed or denied based on the BOP's destruction of all documents relating to the alleged review.  (*See* Doc. 112 at 13 ¶ 58.) Without documentation of any review contemporaneous with his transfer to ADX, the Hearing Administrator necessarily had to guess at what these original reasons were.

100.   Undisputed.

101.   Disputed.  The Hearing Administrator failed to record the actual reason for Mr. Rezaq's "non-appearance" as a request to consult with counsel, such that all procedures were not followed.  (Ex. 3 ¶¶ 6-29; Ex. 16 at US02862.)

102.   Undisputed.

103.   Partially Disputed.  Mr. Rezaq did not sign the acknowledgment form as he was under the impression that it constituted a voluntary waiver of the right to the hearing.  (Ex. 3 ¶ 26.) Since he had merely requested to consult with counsel *prior to* the hearing, he refused to sign a waiver of any such right. (*Id.*)

(104-105.)      Undisputed.

106.   Disputed.  Mr. Rezaq did not "refuse" to provide a urine sample, but rather was unable to urinate on command when the sample was requested.  (Ex. 3 ¶ 22; Ex. 1 at 134:21-23.)  Mr. Rezaq has consistently made good faith efforts to comply with all directives and requests throughout his lengthy incarceration.  Notably, all drug tests that Mr. Rezaq *has* provided during his incarceration have returned negative results.  (Ex. 3 ¶ 22.)

107.   Undisputed.

108.   Partially Disputed.  Plaintiff merely requested a postponement in order to consult with counsel and address his concerns regarding the impact on his pending litigation via a telephone conversation. He did not, in any way, refuse to participate. (Ex. 3 ¶¶ 26-29.)

109.   Partially Disputed. According to Associate Warden Jack Fox, not a single hearing has resulted in the removal of an inmate from the ADX, (Ex. 8 at 145:7-13), and while some inmates' cases focus on misconduct in another facility prior to their transfer, (*see* Ex. 18,

Silverstein Notice of Transfer Hearing, Sep. 9, 2009, at 56-57), Mr. Rezaq's includes conduct

occurring *while* housed at the ADX (Ex. 15 at 1-2).

110.    Disputed.  Plaintiff disputes that Regional Director Nalley followed the procedures set

forth in the Nalley Memorandum, as his ratification of the Hearing Administrator

recommendation appears to be boilerplate language, stating "the inmate will continue his

placement at the ADX in general population," despite Mr. Rezaq's housing in J-Unit, and does

not assess the factual bases for his transfer in any way.   (Ex. 19, "Notice of ADX General

Population Placement," Dec. 16, 2009.)

111.    Undisputed.

### H. Step-Down Admission Process

(112–113.)  Undisputed.

114.  Partially disputed.  The majority of the 95 percent of inmates transferred to the ADX from

other facilities are transferred there for punitive reasons for misconduct in other facilities.  (*See*

Ex. 8 at 73:6-16.)

(115–118.)  Undisputed.

Plaintiff's Additional Facts:

m)  It is extremely rare for inmates to complete the Step-Down Program in the minimum

time periods.  It is *typical* for inmates to spend an indeterminate amount of time in the

Step-Down Program.  (Ex. 8 at 103:20–104:16.)

n)  Inmates can easily be removed from any phase of the Step-Down Program for numerous

reasons including alleged safety concerns to the inmate and other external factors, such as

world events appearing in the media.  (Ex. 20, *ADX Institution Supplement*, Oct. 8, 2009

at US02729 ¶ 5(D)(1)(b); Ex. 8 at 91:21-92:2, 133:6-8, 134:17-25; Ex. 21, Wiley Dep. 61:4-63:8, July 30, 2009.)

o) Plaintiff was denied admission to the Step-Down Program numerous times over the years despite all of the "positive factors" referenced by Assoc. Warden Fox, that were present throughout the years.  (Ex. 8 at 131:21-132:2.)  Reasons offered for Mr. Rezaq's denial from Step-Down have been (1) Mr. Rezaq's failure to mitigate his reasons for placement, (2) the severity of his crime, and (3) his effect on the orderly operation of the facility. (Ex. 22, J-Unit Denials US00407, 419, 420, 421, 431, 433, 597, 615.)  However, the basis of the Warden's decision is unknown to anyone in the BOP, or even to the Warden himself, as he does not recall *any* decisions regarding *any* Step-Down determinations he made. (Ex. 8 at 139:14-143:6; Ex. 21, at 128:12-18.)  Nor could Associate Warden Fox (Chairman of the Committee) recall any of the Committee's reasons for recommending Mr. Rezaq's denial from Step-Down for twelve years. (Ex. 8 at 115:23-25.)

p) The BOP looks at an inmate's conduct to predict his future behavior.  (Ex. 8 at 50:24-25, 87:9-16.)  Mr. Rezaq's conduct in 25 years of incarceration has been non-violent and compliant.  (Ex. 3 ¶ 10.)

119.  Disputed. The Step-Down Committee recommended, and the newly-installed Warden Davis approved, Mr. Rezaq for Step-Down admission during the first week of September.  (Ex. 8 at 127:11-15.) The Warden has unfettered discretion in Step-Down determinations, including the ability to admit an inmate that the Committee recommended *against* admission.  (Ex. 8 at 41:13-18, 57:18-24, 58:23-59:3, 59:17-20, 139:14-17.)

120.  Disputed.  It remains unclear *why* Mr. Rezaq was suddenly admitted to Step-Down.  (Ex. 8

at 131:21-23.)

Plaintiff's Additional Fact (q): Under any of the previous four Institution Supplements (two of

which were issued in the last four months), the evaluation procedures for advancement through

Step-Down are the same procedures as for initial admission: Committee reviews every six

months assessing the same factors and the ultimate decision is made by the Warden. (Ex. 8 at

89:4-13.)

121. Disputed. Associate Warden Fox testified that mitigation has never been the most critical

factor, and that safety and security are the most critical factors, neither of which is listed in the

2008 Institution Supplement. (Ex. 8 at 71:7–71:15). The current Institution Supplement still

lists the original reasons for placement as a factor for Step-Down consideration, as applied to

both admission and advancement. (Ex. 20 at US02727 ¶ 5(C)(1)(e)(v).)

122. Undisputed. The Committee considers the thirteen factors listed in the Institution

Supplement, applying them to each inmate for less than ten minutes. (Ex. 8 at 81:2-5; Ex. 20 at

US02726-27, ¶ 5(c)(1)(e).) However, the Institution Supplement clearly states that the

Committee meeting "is not a hearing. The inmate is not entitled to be present, to have counsel, or

to call witnesses." (Ex. 20 at US02727 ¶ 5(C)(1)(f).)

123. Partially Disputed. These are the same factors that were in existence for Mr. Rezaq for 13

years, and Assoc. Warden Fox was unable to articulate why these positive factors suddenly

resulted in Mr. Rezaq's admission to J-Unit, when they were not persuasive during the preceding

13 years. (Ex. 7 at 10:25 – 11:18.)

124. Partially disputed. During this phone call, Plaintiff merely "asked his family to go tell the

other inmate's family, Hello." (Ex. 7 at 7:13 – 7:18.) The purpose of the call was ultimately to

have the friend's family contact the Jordanian embassy to request diplomatic assistance on his behalf.  (Ex. 1 at 152:7-19.)

(125–126.)  Partially disputed.  The circumstances discussed in the context of his most recent review are the same circumstances that have been in existence for 13 years.  It remains unclear what changed between Plaintiff's previous denials and his sudden acceptance to J-Unit.  (*See* Ex. 7 at 10:25–11:18.)  As Plaintiff was not informed what factors changed to allow his admission to J-Unit, he is unable to rule out his pending litigation against Defendants as a significant factor.

### I.  Conditions of Confinement

127.  Undisputed.

Plaintiff's Additional Fact (r):  Cells in J-Unit are smaller than those in GP.  (Ex. 3 ¶ 15(b).)

128.  Partially disputed.  The windows in J-Unit are identical to those in GP-Unit in size and exposure to indirect sunlight. (Ex. 3 ¶¶ 14-15.)  Mr. Rezaq's window in J-Unit looks out at the recreation yard, providing a view of three cages and some sky, but no natural landscape.  (*Id.*)  Moreover, the window in Mr. Rezaq's cell door looks out into his range.  This internal window is one-third the size of the same internal window in his previous GP-Unit cell.  (*Id.*)

129.  Partially Disputed.  Mr. Rezaq's range currently contains only himself and one other inmate.  (Ex. 3 ¶ 15.)

130.  Disputed.  It is very common for J-Unit inmates to receive less than the "minimum" 10.5 hours of recreation as recreation may be limited due to frequent lockdown measures.  (Ex. 3 ¶¶ 14-15.)  Since Mr. Rezaq arrived in J-Unit three months ago, there have been multiple lockdowns between two and ten days caused by either "inmate fighting or simply because an inmate was rude to staff."  (Ex. 3 ¶ 15(c).)  In J-Unit (unlike GP), outdoor recreation does not

occur on weekends or holidays.  (Ex. 3 ¶¶ 14-15.)

(131–132.)  Undisputed.

133.    Partially Disputed.  Because Mr. Rezaq's family does not live in the United States, they have only visited him twice during his entire incarceration.  (Ex. 3 ¶ 31.)  Visitation occurs through a plexiglass window where talking is done through a telephone.  (*Id.*)

134.    Partially Disputed.  The time spent taking a shower is deducted from an inmate's recreation time for the day.  (Ex. 3 ¶ 15.)

135.    Disputed.  In J-Unit, Mr. Rezaq is able to interact with other inmates during the brief periods when inmates on his unit are out of their cells; however, there is currently only one other inmate on his range with whom he takes indoor recreation and sees when he retrieves his meals, a task that gains him approximately 20-30 seconds of time outside his cell.  (Ex. 3 ¶15.)  When inside his cell in J-Unit, Mr. Rezaq can only communicate with other inmates in J-Unit by shouting.  (Ex. 3 ¶ 15(f).)  In GP-Unit, Mr. Rezaq could sometimes communicate in moderate tones with the cell directly adjacent, but not with any other cell.  (Ex. 3 ¶ 14(c).)

136.    Partially disputed.  In J-Unit, outdoor recreation is offered 2-3 times per week (not including weekends or holidays) for one and a half hours, and inmates may choose to take the recreation indoors. (Ex. 3 ¶ 15.)  In GP-Unit, inmates receive two hours of outdoor recreation, alternating between two and three days per week.  (Ex. 3 ¶ 14(e).)  Outdoor "recreation" in both units consists of a one-person cage containing only a pull-up bar and facing the prison on one side and a 20-foot wall on the other.  (Ex. 3 ¶ 14-15.)  There is a 20-foot wall surrounding the recreation cages so that inmates cannot see anything but the sky and the prison.  (*Id.*)  Outdoor recreation is frequently unavailable due to lockdown conditions or staff shortages.  (*Id.*)

(137-138.)  Undisputed.

139.  Disputed.  Contact with staff making rounds occurs through an inmate's cell door.  (Ex. 3 ¶ 16.)  In GP-Unit, there were two doors; one barred and one solid steel, so staff sometimes talked through the bars.  (*Id.*)  In J-Unit, there is only the solid steel door, so any talking takes place through that.  (*Id.*)  Contact beyond a merely functional provision of meals is not a daily occurrence.  (*Id. at* ¶ 16(f).)

140.  Disputed.  In both D- and J-Unit, rounds are *not* weekly in practice.  (Ex. 3 ¶ 16(a)-(f).) During Mr. Rezaq's entire three-month tenure in J-Unit, he has seen the Warden make rounds only two or three times; he is sometimes accompanied by the Captain or Associate Warden. (Ex. 3 ¶ 16(b).)  Mr. Rezaq's Counselor makes rounds about four days per week; his Case Manager once or twice per week.  (Ex. 3 ¶ 16(c).)  During rounds by administrative staff, the unit is on lockdown and inmates only speak with the staff if they affirmatively stop them to address a concern.  (Ex. 3 ¶ 16.)  If inmates do not stop them, they do not even look into their cells.  (*Id.*) The duration of such interactions depends on the substance, but usually lasts only 30 seconds. (Ex. 3 ¶ 16(b).)

141.  Partially Disputed.  Interactions with correctional staff are purely functional for coordinating movement to and from recreation or providing meals.  (Ex. 3 ¶ 16(f).)

142. Disputed.  Because Mr. Rezaq receives medication for depression, he sees psychology staff once every five to six months for approximately five minutes. (Ex. 3 ¶ 16(a).)  In GP-Unit, such visits were done through the barred cell door; in J-Unit he is either taken to a special room in shackles, or it will occur through the door, or at the door at the end of the unit range.  (*Id.*)

(143 – 146.)  Undisputed.

**J.  Current Step-Down Process Apply Going Forward Is the Same as For Admission**

(147-148.)  Partially disputed.  Associate Warden Fox testified that there is not a significant difference between the 2008 Supplement and the 2009 Supplement; that the factors are simply "more clearly spelled out" in the 2009 Supplement.  (Ex. 8 at 72:13–72:18.)  It is unclear what factors are actually used during Step-Down reviews, and specifically what factors have been and will be used by Defendants when assessing Mr. Rezaq for Step-Down admission and progression.  (*See* Doc. 112 at 28 ¶ 153; Ex. 7 at 10:25–11:18; Ex. 8 at 120:25.)  The Institution Supplement was amended again on December 8, 2009.  The Warden's ultimate decision-making power regarding an inmate's placement in, or advancement through, the Step-Down Program is undisputed.

149.  Disputed.  Although Mr. Rezaq was admitted to Step-Down, "re-mitigation" of his reasons for placement in ADX could be required: "Q:  Okay.  Could Mr. Rezaq's original reasons for placement at the ADX, again, be something that prevents him from successfully completing the program; from progressing from J to K and K to the pre-transfer unit? / A:  It could."  Ex. 8 at 136:13-17.)  The 2009 Supplement merely rephrases the 2008 Supplement's use of mitigation of the reasons for placement at the ADX, employing similar terms, such as the reason(s) the inmate was designated to the ADX; the inmate's criminal history; and the inmate's overall adjustment during his history of confinement.  (Ex. 8 at 130:12-131:6.) These terms appear to be used in the same manner as the mitigating factor previously was.

150.  Undisputed.

151.  Partially disputed.  Although, Plaintiff will be *eligible* if he meets the listed factors, it is unknown what *additional* factors will be considered for his advancement in the Step-Down

Program in light of the discretionary power of the Warden with no obligation to justify his decision with reasons. (*See* Doc. 112 at 28 ¶ 153; Ex. 8 46:3-23, 54:18-22, 55:7-56:4; Ex. 21 at 129:8-130:25.)

152.  Disputed.  It is, again, unknown what factors will be used to allow him to continue to participate and advance in the Step-Down Program.

153.  Undisputed.

154.  Partially disputed.  It is unknown what other factors will also be used to assess Mr. Rezaq's ability to continue to participate and advance through the Step-Down Program.

155.    Partially Disputed.  Mr. Rezaq's written notice of his admission to J-Unit, dated September 21, 2009, was never provided by BOP staff and he only received it when it was presented to him by opposing counsel as an exhibit during his deposition on October 9, 2009. (Ex. 1 136:1-12; Ex. 23, Rezaq Approval for Placement in J-Unit, Sep. 21, 2009.)

156.    Undisputed.

157.    Disputed.  The reasons provided to Mr. Rezaq for denial have consisted of vague statements that appear generic in nature.  (*See* Ex. 22.)  Furthermore, Mr. Rezaq testified that he could not understand from the vague explanations contained in his denial notices why it was that he was continually denied admission into the program.  (Ex. 1 at 118:3-119:24.)

(158–159.)  Undisputed.

160.  Partially disputed.  Plaintiff has utilized the Bureau's Administrative Remedy Program and has never received a response addressing the *substance* of his complaints or achieved a change in the decision to deny him entrance into Step-Down. (Ex. 1 at 118:3-122:15; Ex. 24, Selected Rezaq Admin. Remedies, at US01942-51, US02062-74, US02221-33, US02385-99.)

Furthermore, Associate Warden Fox stated that he has *never* known of an inmate utilizing the

Administrative Remedy Program to successfully overturn a decision denying that inmate entry to

the Step-Down Program.  (Ex. 8 at 96:3–96:24.)

## IV.  ARGUMENT

### A. Legal Standard

#### 1.  Standard of Review for Summary Judgment

Summary judgment is appropriate when the pleadings present no genuine issue as to any

material fact such that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Only "[w]here the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [is] there

[] no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986) (internal citations omitted).  The court must view the factual record and reasonable

inferences therefrom in the light most favorable to the party opposing summary judgment. *Byers*

*v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (internal citations omitted).  In

viewing the evidence the nonmovant is generally "given wide berth to prove a factual

controversy exists." *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995).  "Where different

ultimate inferences may be drawn from the evidence presented by the parties, the case is not one

for summary judgment." *Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984).

It is the moving party's burden to establish that there are no disputed facts and that it is

entitled to summary judgment as a matter of law.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d

664, 670-71 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  In so

doing, "the defendants must make more than a simple conclusory assertion" that the plaintiff will

not prevail at trial, "otherwise summary judgment would be converted into a tool for harassment." *Coit v. Zavaras*, 175 Fed. App'x 226, 229 (10th Cir. 2006) (internal quotations omitted).  Defendants have failed to meet their burden in requesting summary judgment in this matter.  In this case, Plaintiff has presented numerous disputed facts, many of which are material to the specific legal issues in question.  As "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *Anderson*, 477 U.S. at 248, the disputed facts in Mr. Rezaq's case preclude this Court from rendering judgment as a matter of law.

### 2.  Mandamus Standard for Injunctive Relief

Defendants assert that the mandamus standards apply to Plaintiff's injunctive relief request as it potentially imposes upon the BOP's agency discretion.  Defendants claim that mandamus relief is available in requesting injunctive relief for *non*discretionary actions.  *Simmat v. Bureau of Prisons*, 413 F.3d 1225, 1235 (10th Cir. 2005).  Because it is not within the discretion of the BOP to violate an inmate's due process rights and it is the provision of constitutionally sound due process that is requested, the relief sought by Plaintiff is available in this case.

### B. Mr. Rezaq Has a Liberty Interest in Participation in Step-Down to Achieve Transfer to a Less-Restrictive Facility

Mr. Rezaq has a liberty interest in avoiding his current conditions of confinement at the ADX via participation in the Step-Down Program ("Step-Down"). The extreme conditions at the ADX are unparalleled in the federal prison system, thereby meeting the standard for finding a liberty interest as defined by the U.S. Supreme Court.  As outlined in Plaintiff's Statement of Facts, Mr. Rezaq disputes Defendants' characterization of his conditions of confinement as being

limited to those in J-Unit.  The nearly identical nature of J-Unit and ADX GP conditions, as well as the continued likelihood of Mr. Rezaq's return to GP under the BOP's arbitrary decision-making process require consideration of those conditions jointly to assess whether Mr. Rezaq has a liberty interest.

While "prisoners held in lawful confinement have their liberty interest curtailed by definition," prisoners do not lose all their constitutional rights once they are confined. *Wilkinson*, *v. Austin*, 545 U.S. 209, 225 (2005).  *See also Sandin v. Conner*, 515 U.S. 472, 485 (1995) ("prisoners do not shed all constitutional rights at the prison gate"); *DiMarco v. Wyoming Dept. of Corrections, Div. of Prisons*, 473 F.3d 1334, 1339 (10th Cir. 2007).  As set forth below, the unique nature of the ADX conditions of confinement impose an atypical and significant hardship as compared with the ordinary incidents of prison life.  *See Wilkinson* 545 U.S. at 223; *Sandin*, 515 U.S. at 484; *DiMarco*, 473 F.3d at 1339.

Determining whether a particular inmate's conditions give rise to a liberty interest requires a case-by-case assessment.  *Sandin*, 515 U.S. at 484.  The Tenth Circuit articulates four non-dispositive factors that may lead to a finding of atypical and significant hardship:

> Relevant factors might include whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement, as it did in *Wilkinson;* and (4) the placement is indeterminate (in *Wilkinson* the placement was reviewed only annually).

*DiMarco*, 473 F.3d at 1342.  Here, Defendants' Motion fails to establish that, as a matter of law, Mr. Rezaq lacks a liberty interest.  Rather, application of the four *DiMarco* factors demonstrates that Mr. Rezaq has a liberty interest in avoiding further confinement at the ADX, or, at minimum, that there are disputed issues of fact regarding whether such interest exists.

### 1. Defendants Have not Established a Legitimate Penological Interest in Housing Mr. Rezaq at the ADX

In assessing whether a liberty interest exists, the Tenth Circuit first considers whether there is a legitimate penological interest in an inmate's continued segregation. *DiMarco*, 473 F.3d at 1342. The BOP asserts security as its only justification for continuing to confine Mr. Rezaq at the ADX. (Doc. 112 at 35.) While Plaintiff does not dispute that security is, in general, a legitimate penological interest, here there are many disputed issues of fact as to whether Mr. Rezaq presents the kind of safety concerns that warrant ADX placement. As a result, the BOP fails to demonstrate, as a matter of law, that Mr. Rezaq is a security risk, or that the ADX is the only place he can be safely housed.

As this Court has held, a legitimate penological interest may result from an inmate's conduct *within* the prison, or when an inmate is "incapable of functioning in a less restrictive environment." *Rezaq v. Nalley*, No. 07-CV-02483, 2008 WL 5172363, at *8 (D. Colo. Dec. 10, 2008). An inmate's actions may create a safety or security risk in situations when his chronic behavior or the occurrence of a severe incident makes clear that he cannot be safely housed in another, less restrictive facility. *See, e.g.*, *DiMarco*, 473 F.3d at 1342; *Toevs v. Reid*, No. 06-CV-01620, 2009 WL 598258, at *7 (D. Colo. Mar. 6, 2009); *Stine v. Lappin*, No. 07-CV-01839, 2009 WL 103659, at *8 (D. Colo. Jan. 14, 2009); *Hale v. Ashcroft*, No. 06-CV-00541, 2008 WL 4426125, at *4 (D. Colo. Sept. 24, 2008) (not reported in F. Supp.).

Defendants fail to establish that Mr. Rezaq's conduct within the BOP, or any correctional facility in which he has been confined since 1985, supports finding a legitimate interest in his current conditions. Mr. Rezaq's conduct has been unimpeachable, and his behavior in prison does not pose a danger to the safe and secure running of a facility. (PSF at 20, Add'l Fact p.) In

his twenty-five years of confinement, the one blemish on Mr. Rezaq's record reflects his inability to urinate on command for a drug test at the ADX.[3] (PSF ¶ 106.)

Mr. Rezaq has not only refrained from misconduct, but has sustained positive behavior during the whole of his twenty-five-year imprisonment. (PSF at 20, Add'l Fact p.) In Malta, he interacted well with staff, creating such positive relationships that the Prison Director in Malta came to the United States to provide character testimony at Mr. Rezaq's criminal trial. (PSF at 5, Add'l Fact b.) Once he was confined to the ADX, Mr. Rezaq meticulously adhered to the high standards of behavior by being polite to staff and other inmates, completing and often exceeding educational programming requirements maintaining a neat cell, and maintaining good personal hygiene. (PSF ¶ 123.) Additionally, in his first eight years of incarceration at ADX, when that facility offered group recreation, Mr. Rezaq never had an altercation on the yard, and in fact assisted in breaking up fights on more than one occasion. (PSF, at 10-11, Add'l Fact l.) In sum, despite Mr. Rezaq's rigorous adherence to literally every rule in the book, the BOP consistently employs vague safety justifications for his restrictive conditions.

In his deposition in this case, Associate Warden Fox testified that past behavior is the best predictor of a prisoner's future behavior. (PSF at 20, Add'l Fact p.) Following this logic, which allegedly guides the Step-Down Committee, Mr. Rezaq remains perplexed as to the basis for his solitary confinement. (PSF ¶ 157.) None of his past behavior in the prior twenty-five years indicates his safety risk is high: he has had no incident reports that implicate safety or security, no contact with outside organizations, and has met or exceeded all behavioral expectations. (PSF ¶ 59; PSF at 5-6, 10-11, Add'l Facts b, c, l.)

_____

[3] Since that day, Mr. Rezaq has completed all drug tests, each with negative results. (PSF ¶ 106.)

Defendants claim that Mr. Rezaq's military training creates a legitimate penological interest in housing him at the ADX;  however, Mr. Rezaq disputes this assertion based on two crucial disputed facts.  (Doc. 112 at 35.)   First, Mr. Rezaq's military training was not nearly as extensive as Defendants portray, and second, in twenty-five years of incarceration, this training has never actually created a safety or security risk.[4]  (PSF ¶¶ 8, 52.)  Beyond the undisputed fact that he has never caused a safety problem, Mr. Rezaq also proffers that while incarcerated in Malta, he worked in the fitters shop, often without supervision, with various tools and devices that could have been used as a weapon, even by someone with no military training.  (PSF at 5, Add'l Fact b.)  Moreover, when a prison administrator in Malta experienced a heart attack in his presence, Mr. Rezaq took immediate steps to acquire medical assistance for him.  (PSF at 5, Add'l Fact b.)    Indeed, Mr. Rezaq has comported himself non-violently throughout his entire incarceration.  (PSF ¶ 59; PSF at 5-6, 10-11, Add'l Facts b, c, l.) Moreover, Mr. Rezaq's advanced age and significant remorse for his actions further support that he does not pose any current safety or security risk.  (PSF at 5, Add'l Fact a.)

To the extent that Defendants argue that the nature of Mr. Rezaq's crime, or his former involvement with a terrorist organization (*see* Doc. 112 at 35-36), creates a legitimate

---

[4] Plaintiff asserts that other individuals with materially similar training are housed in other institutions throughout the BOP. Defense Expert Les Smith testified that Security Threat Group ("STG") and Management Interest Group ("MIG") classifications have no bearing on an individual's classification and that inmates with advanced military skills are likely housed in many security levels.  (Ex. 5 at 45:13-18, 81:13-82:1.)  Mr. Rezaq is classified into several groups related to the specific skills that Defendants allege create a legitimate interest in his isolation. (Doc. 112 at 35.)  These include "advanced military skills" and "bomb manufacture."  Plaintiff currently has a motion outstanding to compel testimony that indicates that people will skills similar to those possessed by Mr. Rezaq are housed at lower level institutions.  Should the BOP be capable, as indicated by the housing of others, of safely housing individuals with these skills in less restrictive facilities, this would no longer establish a sufficient "legitimate" basis for isolation.  Accordingly, it would not be reasonable for these skills alone to be sufficient basis for housing him at ADX.

penological interest in keeping him at the ADX, this assertion is contradicted by evidence in the record.  Defendants' own safety and security expert, Leslie Smith, stated that the BOP's primary concern in housing terrorist inmates is the ability to monitor their communications. (Ex. 5 at 46:1-49:14.)  Putting aside the fact that Mr. Rezaq has never made a single attempt to contact anyone affiliated with terrorism in twenty-five years, Mr. Smith also went on to testify that all levels of BOP facilities, from minimum security to supermax, have the capability to monitor inmates' communications.  (*Id.*)  In fact, Mr. Smith testified that there are currently terrorist inmates residing in facilities of every security level including prison camps.  (Ex. 5 at 44:4-5.) Therefore, the fact of Mr. Rezaq's crime may be being used by Defendants as a pretense for retaining him in ADX when in truth it does not prevent him from being safely housed elsewhere.[5]

Finally, Defendants further claim that Mr. Rezaq has a "commitment to violence" that creates a legitimate penological interest (Doc. 112 at 35).  This assertion also has no support in the record. Mr. Rezaq has had no contact with any terrorist organizations or their members since the day of his crime.  (PSF ¶ 31.)  Mr. Rezaq testified that when he arrived at the Malta prison, he was able to think clearly, independently, and absent outside influences for the first time in years.  *Id.*  He immediately made the decision never again to contact any of his former

---

[5] Even if the undisputed facts did not reveal the appropriateness of lower level facilities, an inmate's crime of conviction has not been recognized as a legitimate penological interest in the District of Colorado in order to institute a transfer to ADX. *See Stine v. Lappin*, No. 07-CV-01839, 2009 WL 103659, at *9 (D. Colo. Jan. 14, 2009). The *Stine* court noted that, "if Plaintiff's underlying convictions were a legitimate justification for his placement at ADX, placement there would have been warranted at the time of his *initial incarceration.*" *Id.* (emphasis added).   In other words, Plaintiff's crime of conviction can only legitimately impact his *initial* designation, not his subsequent transfer to the ADX.

organizations, and he has maintained that commitment ever since. *Id* [6] In light of these facts, Plaintiff disputes that he has a commitment to violence and that he poses a risk justifying his continued detention at the ADX.

### 2. Mr. Rezaq's Conditions of Confinement Now, and for the Past 13 Years, Are Extreme Under Any Baseline

The second *DiMarco* factor evaluates whether the conditions of confinement are extreme. Defendants argue that, as a matter of law, only the conditions in J-Unit are relevant (as this is where Mr. Rezaq is currently housed), and that the undisputed facts do not establish that the conditions are extreme. (Doc. 112 at 37.) However, Plaintiff disputes many of the material facts alleged by Defendants regarding his conditions. Further, even solely relying on those facts that are not in dispute, Mr. Rezaq asserts that a liberty interest exists in the conditions of J-Unit, where he has been housed since September of 2009, and in the functionally identical conditions of the GP-Unit where he was confined for the prior thirteen years. (PSF ¶¶127-146.) Mr. Rezaq asserts that these conditions are extreme and that his thirteen-year incarceration under these conditions constitutes an atypical and significant hardship.

The Supreme Court in *Wilkinson* found a liberty interest under circumstances that are substantially similar to those at the ADX. *Wilkinson*, 545 U.S. at 214. The Court described the conditions at the Ohio State Penitentiary ("OSP") thus:

> Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells... OSP cells have solid metal doors with metal strips along their sides and

---

[6] Mr. Rezaq testified that he was not ideologically linked with the groups even while a member, but for the actions he took under their imprimatur, he has expressed deepest remorse. (PSF at 8-9, Add'l Fact h.)

bottoms which prevent conversation or communication with other inmates.  All meals are taken alone in the inmate's cell instead of in a common eating area.  Opportunities for visitation are rare and in all events are conducted through glass walls.

*Id.* at 214.

Despite Defendants' assertions to the contrary, Mr. Rezaq's conditions essentially parallel, and often are even more restrictive than, those in *Wilkinson*.  For instance, as Defendants note, the cell in *Wilkinson* measured 98 square feet, while Mr. Rezaq's cell is merely 75.5 square feet.  (Doc. 112 at 39.)  Defendants also state that "inmates receive a minimum of 10.5 hours per week," and that this recreation "may be indoor or outdoor, where inmates have access to sunlight and fresh air."  (*Id.*)  However, recreation in J-Unit does not always follow the policy requirement, is unavailable on weekends, and is frequently cancelled. (PSF ¶ 136.)

Defendants rely exclusively on *Wilkinson* to assert that conditions in J-Unit do not establish a liberty interest,[7] treating each *Wilkinson* condition as if it is a dispositive requirement to the determination of a liberty interest. (Doc. 112 at 37-40.)  This application misunderstands

---

[7] Defendants additionally rely on four other cases for the proposition that the Tenth Circuit has never found that conditions at the ADX are extreme.  As an initial matter, *all* of these cases are pre-*DiMarco*, and thus, did not consider the ADX conditions under the relevant standard.  Second, Defendants ignore that after *DiMarco*, many decisions from this District have determined that, at least as pled in multiple ADX prisoner complaints, the ADX conditions implicate a liberty interest. *Stine v. Lappin*, 2009 WL 103659, at * 10; *Georgacarakos v. Wiley*, No. 07-cv-01712, 2008 WL 4216265, at *16 (D. Colo. Sept.12,2008)..  Finally, even if the cases re-*DiMarco* cases were applicable, each is distinguishable from Mr. Rezaq's case.  First, the claim in *Jordan* was based on a confinement of four years, while Mr. Rezaq has been confined at the ADX for 13 years, and most importantly, Jordan's confinement was "not indefinite but instead limited to the duration of the pending murder investigation." *Jordan v. Fed. Bureau of Prisons*, 191 F. App'x 639, 652 (10th Cir. 2006) (unpublished).  Second, in *Hill*, a 399-day confinement was not a lengthy enough duration to merit a liberty interest or to put prison officials on notice of such.  Again, Mr. Rezaq's 13-year internment at the ADX is certainly extreme in duration by any standards.  Third, in *Muhammed v. Hood*, the inmate was transferred from a Step-Down unit back to GP, which is not part of Mr. Rezaq's claim, as he only wishes to be allowed to move forward through Step-Down. *Muhammed v. Hood*, 100 F. App'x 782, 783 (10th Cir. 2004) (Unpublished).  Finally, in *Muhammed v. Finley*, the inmate was merely in a time-limited disciplinary segregation.  *Muhammed v. Finley,* 74 F. App'x 847, 849 (10th Cir. 2003) (unpublished).

that the law requires a case-by-case factual inquiry.  Indeed, decisions from the Tenth Circuit and

the District of Colorado provide numerous examples of conditions sufficient to allege a liberty

interest that are not identical to those in *Wilkinson*.  In *Stine v. Lappin*, this Court noted that the

plaintiff-inmate had alleged facts sufficient to show a liberty interest where he "is confined alone

in a cell and not allowed to converse with inmates in adjoining cells," "eats his meals alone in his

cell, and when he is allowed recreation, he must do so in a fenced-in cage, or "dog cage," and *"*is

denied human contact, and visitation is conducted through glass." *Stine,* 2009 WL 103659, at *2

*See also Fogle v. Pierson* 435 F.3d 1252, 1259 (10th Cir. 2006) (finding district court abused its

discretion in concluding there was no *arguable* basis that three-year administrative segregation

of solitary confinement for all but five hours each week and no outdoor recreation is "atypical");

*Gaines v. Stenseng*, 292 F.3d 1222, 1225-26 (10th Cir. 2002) (reviewing dismissal of § 1983

claim de novo and ruling that, without "carefully examin[ing] the conditions of the prisoner's

confinement," it was error to find 75-day disciplinary segregation not atypical); *Georgacarakos

v. Wiley*, No. 07-CV-01712, 2008 WL 4216265, at *15-16 (D. Colo. Sep. 12, 2008) (same).

As an initial matter, Plaintiff notes that the permanent solitary conditions within a

"supermax" facility such as the ADX must be distinguished from segregation in a true "general

population" prison setting, where such confinement is inherently temporary and the penological

interest is either punitive or administrative.  It is undisputed that the conditions of confinement at

the ADX are designed to be the most restrictive within the federal prison system.  (Ex. 2, Church

Dep. 42:12-14, Oct. 1, 2009.).

In J-Unit, Mr. Rezaq lives in solitary confinement.  (PSF ¶ 135.)  The cell is

approximately 75 square feet, containing a poured concrete bed and desk.  (*Id.* at ¶ 127.)  There

is one window facing into the range, and one window facing outside, allowing for a view of three recreation cages, a small yard and a sliver of sky, with some indirect sunlight.  (*Id.* at ¶ 128.) Within the cell, there is no way for Mr. Rezaq to speak with other inmates unless he shouts through vents or plumbing, and shouting is not allowed.  (*Id.* at ¶ 135.)  In J-Unit, the only time inmates leave their cells is when they are allowed to go out into the range in groups of no more than eight for 60 minutes of interaction, or during the 30 seconds in which they go from their cells to get their meal trays each day.  (*Id.*)  Inmates take all their meals alone in their cells.  (*Id.*) The ADX staff who perform "rounds," including psychology staff, typically speak with inmates briefly and through the solid steel door of their cells.  (PSF ¶ 142; Ex. C ¶ 16(a).)  If the interaction occurs outside of the cell, the inmate is restrained and at least two corrections officers, one maintaining control of the restraints and the other with a baton, are present.  (*Id. See also*, Doc. 112, Ex. A-2 at 12-13, ¶ 37.)

Inmates in both the GP-Unit and J-Unit ordinarily require shackles, behind the back, when being moved from their cells, and may be subjected to a strip search. (Doc. 112, Ex. A-2 at 8-9, ¶ 28(a)-(b).)  Any time a GP inmate or J-Unit inmate is handcuffed from the front—which occurs whenever he leaves the unit—a Martin chain, black box and leg irons are used.  (*Id.* at 12, ¶ 37.)   The inmate is escorted by two staff, one of whom carries a baton while the other maintains control of the handcuffs.  (*Id.*)

In J-Unit, Mr. Rezaq is only allowed three 15-minute phone calls per month.  (*Id.* at 9, ¶ 28(b).) Also, ADX policy provides that prisoners confined in both the GP-Unit and J-Unit are limited to five social visits per month. (*Id.* at 8-9, ¶ 28(a)-(b).)  The conditions in which the social visits take place, however, are extremely limiting.  All social visits take place in small

booths in which the prisoner is separated from his visitor by a thick pane of glass.  (PSF ¶ 133; Ex. C ¶ 31.)  ADX prisoners cannot ever touch or embrace a spouse, parent or child.  (*Id.*)

|Recreation is both outdoors and indoors.  (PSF ¶ 136.)  Outdoor recreation, which is offered about twice a week, is taken alone in one of three 10' x 10' cages referred to as "dog runs," that contain only a pull-up bar for equipment.  (*Id.*)  Cages are located between the prison and a twenty-foot wall, allowing only a partial view of the sky.  (*Id.*)  Mr. Rezaq's indoor recreation currently consists of walking around the range alone or with the one other inmate on in his unit.  (*Id.*)  Notably, recreation is often not available in any form when the inmates have been placed on lockdown.  (*Id.*)  In the three months since Mr. Rezaq has been in J-Unit, there have been multiple lockdowns, some lasting longer than a week at a time.  (*Id.*)  Lockdowns can be triggered by various catalysts, ranging from something as insignificant as inmates' haircuts to a skirmish on the range. (Ex. 3 ¶ 15(c).)

In the nearly thirteen years that Mr. Rezaq was confined in GP, his conditions were nearly identical to those in J-Unit; however, the cells in GP are larger to accommodate a shower, and rather than leaving the cell for less than a minute to fetch their own meals, staff bring the meals to the inmates.  (PSF ¶135.)  The time for recreation in GP is 10 hours – nearly identical to J-Unit, which allows for half an hour less per week – and still consists of the same two indoor and "outdoor" varieties, with outdoor recreation being offered three times per week at most, and indoor recreation spent alone.  (*Id.* at ¶ 136.)

While many courts have discussed conditions in light of a baseline of comparison,[8] a

---

[8] Should this Court require a baseline for assessing the extremity of conditions, Plaintiff proposes that the most logical baseline of comparison for Mr. Rezaq is to the institution to which he was originally

liberty interest may be established based on the extremity of conditions without a baseline where they are significant enough to support an atypical and significant hardship "compared to any plausible baseline." *Wilkinson*, 545 U.S. at 210. Because of the extremity of conditions, as in *Wilkinson*, a baseline comparison may not be necessary to conclude that ADX conditions as applied to Mr. Rezaq impose an atypical and significant hardship.

        a) *The Duration of Confinement May Inform a Finding Regarding Extremity of Conditions*

Even if the Court does not find that the conditions at the ADX inherently constitute an atypical and significant hardship, the very long duration of those conditions is relevant to the determination of a liberty interest. *Toevs*, 2009 WL 598858, at *9.

The Supreme Court has consistently relied upon the duration of restrictive conditions in determining whether a liberty interest exists. The *Sandin* Court found no liberty interest protecting against a 30-day assignment to segregated confinement as it did not "present a dramatic departure from the basic conditions of [the inmate's] sentence, because the short duration of segregation worked no "major disruption in the inmate's environment." *Sandin*, 515

---

designated pursuant to sound correctional judgment: USP Leavenworth. In Leavenworth, inmates are in a true open population setting, meaning they are out of their cells for most of the day and interacting with other inmates and staff, consuming their meals with other inmates, working, and are receiving much more extensive telephone communication privileges, contact visits with friends and family, group prayer, and more formal, skills-based education opportunities. By comparison, Mr. Rezaq's conditions are clearly atypical and significant.

    In the alternative, the *DiMarco* court identified a more personalized baseline for "uniquely placed or difficult to place" inmates by comparing conditions to those of inmates with similar characteristics. 473 F.3d at 1341. Plaintiff therefore suggests comparison inmates with similar Security Threat Group assignments, including military training and "terrorist" classifications. Plaintiff has filed a motion to compel database reports showing the specific housing assignments of these comparable inmates. (Doc. However, BOP expert Les Smith's testimony reveals that such inmates are housed in all levels of BOP facilities with a range of less restrictive conditions. Therefore, it appears that Mr. Rezaq's conditions are atypical and significant as compared to other inmates with similar risk levels.

U.S. at 486. On the other hand, in finding a liberty interest in *Wilkinson*, the Supreme Court explained that while the conditions alone may not have established a liberty interest, the length of time within the restrictions led to this conclusion. *Wilkinson*, 545 U.S. at 223-34.

District courts in the Tenth Circuit have relied heavily on the duration of confinement in assessing the harshness of conditions. For instance, district courts found that a 750-day placement and a 1700-day placement were both sufficiently long to support a finding of a liberty interest. *Toevs,*2009 WL 598258, at *8; *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir.2006). *See also*, *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (stating that confinement in SHU exceeding 305 days was atypical); *Shoats v. Horn,* 213 F.3d 140, 144 (3d Cir.2000) (prisoner's almost eight years in administrative custody was "atypical"). In *Toevs* the court made explicit that while the conditions alone would not *create* a liberty interest, prolonged stay within certain conditions could implicate due process protections. *Toevs*, 2009 WL 598858, at *9.

Mr. Rezaq has been confined at the ADX for exactly thirteen years, or 4,745 days (Ex. 3 ¶ 9), almost three times longer than the 1700 days meriting a liberty interest in *Robinson*, and certainly long enough to work a "major disruption" in his environment. As a result, this Court should weigh the extremity of conditions, as well as the duration of confinement in those conditions, in assessing whether Mr. Rezaq has a liberty interest.

### 3. Mr. Rezaq's Detention at the ADX May Increase the Duration of his Sentence Overall, Weighing in Favor of a Liberty Interest

The third *DiMarco* factor measures whether the placement extends the duration of confinement. *DiMarco*, 473 F.3d at 1342. Placement is deemed to increase the duration of an inmate's sentence if an inmate is disqualified for parole consideration or is prevented from earning good credit time. *Wilkinson*, 545 U.S. at 214-15; *Muhammad v. Wiley*, 330 F. App'x

165, 167 (10th Cir. 2009).   Notably, the *lack* of increased duration does not weigh against the finding of a liberty interest.  *Cooper v. Cagle*, No. CIV-06-881-C, 2009 WL 883789, at *11 (W.D. Okla. Mar. 30, 2009).   District courts consistently find that this factor is not dispositive and it has not weighed heavily against ADX inmates in particular.  *See Ajaj v. U.S.*, No. 03-CV-01959, 2006 WL 3797871, at *10 (D. Colo. Dec. 22, 2006) (not reported in F. Supp.); *Rezaq*, 2008 WL 5172363, at *9; *Stine*, 2009 WL 103659, at *9.

Defendants have not asserted any facts demonstrating that placement at the ADX does *not* affect parole or extra good time.  Furthermore, Plaintiff maintains that his wrongful confinement to, and restriction at, the ADX has stigmatized him at his parole hearings, and may well be a factor in the parole committee's decision-making process.  (PSF ¶ 45.)

### 4. Mr. Rezaq's Placement at the ADX is Indeterminate

The fourth *DiMarco* factor examines whether the placement is indeterminate, which under a plain language reading, questions whether the placement is for an unknown amount of time.  The Supreme Court has recently adopted a two-pronged assessment of this factor:  whether the placement has no fixed end date and whether there are regular, meaningful re-evaluations with criteria that allow an inmate some control over the length of the placement.  *Wilkinson*, 545 U.S. at 214-15; *Rezaq*, 2008 WL 5172363, at *9.

Considering the first prong of this inquiry, the Supreme Court has found assignments to be indefinite when the length of placement is only "limited only by an inmate's sentence" rather than by a set end date.  *Wilkinson,* 545 U.S. at 214-15. Additionally, without an assignment for "a specific number of days" courts have found placement to be indeterminate. *See*, *e.g., Cooper*, 2009 WL 883789, at *12.  In contrast to *Sandin*'s 30-day assignment, Mr. Rezaq has a life

sentence pending parole, and his placement in ADX is indeterminate.

As to the second part of the inquiry, the presence and regularity of meaningful evaluations, the Court found that there must be an adequate review process in which the inmate has some control over his time in segregation in order for the placement to be considered definite and not atypical and significant. *Wilkinson*, 545 U.S. at 224. In *Wilkinson*, an annual review process was considered insufficient. While both *Sandin* and *Wilkinson* examine the presence and frequency of reviews, *DiMarco* also considers the substance of those reviews. *Sandin,* 515 U.S. at 481; *Wilkinson, 545 U.S. at 224; DiMarco*, 473 F.3d at 1343 (examining the composition of review team and factors considered in evaluating progress and establishing goals).

Although Mr. Rezaq receives reviews approximately every six months, the substance of those reviews is virtually meaningless. (PSF ¶ 62.) This meager amount of review is the common thread running through the entire review process at the ADX, a process that is dependent upon the whim of ADX staff at every juncture, and may be changed at any time, forming a stop-gap to suit the interim need of the BOP, as discussed in Section C below. *Id*. at 60-77, 119. Defendants assert that Mr. Rezaq receives three types of review; however, Plaintiff disputes that these three levels are "regular" or "meaningful" in any discernable way. (Doc. 112 at 50-51; PSF ¶¶ 60-69.) Notably, these three categories have only recently been characterized as "process," and are truly eleventh-hour attempts on the part of the BOP to construct an artifice of process designed for the benefit of the Court. Mr. Rezaq clearly has no control over his continued placement, as evidenced by his continued Step-Down denials despite thirteen years of exemplary conduct.

As a result of the foregoing, Mr. Rezaq has a liberty interest in avoiding the conditions of

confinement at the ADX.  Defendants have failed to meet their burden of demonstrating

otherwise, especially given that all of the above disputed facts must be construed in the light

most favorable to Mr. Rezaq.  Because Mr. Rezaq has a liberty interest, he must be provided

with process sufficient to protect that interest.

## C.  Mr. Rezaq Has Not Received Constitutionally Sufficient Process

Once a liberty interest has been established, the due process analysis turns to the

adequacy of the existing procedural safeguards in light of that interest.  Assessing the

constitutional sufficiency of existing process follows a three-prong balancing test.  *Mathews v.*

*Eldridge*, 424 U.S. 319, 334-5 (1976).  This framework requires consideration of the following:

> First, the private interest that will be affected by the official action; second, the
> risk of an erroneous deprivation of such interest through the procedures used, and
> the probable value, if any, of additional or substitute procedural safeguards; and
> finally, the Government's interest, including the function involved and the fiscal
> and administrative burdens that the additional or substitute procedural
> requirement would entail.

*Id.* at 335.  The Supreme Court has been reluctant to institute a rigid procedure for

establishing the second element, and instead has embraced a broad framework designed

"to evaluate the sufficiency of particular procedures."  *Wilkinson* 545 U.S. at 224.  The

federal courts have recognized, however, that "a fundamental requirement of all due

process is that it be 'meaningful' and not a sham or a fraud."  *Toevs*, 2009 WL 598258, at

*8 (quoting *McClary v. Coughlin*, 87 F. Supp. 2d 205, 214 (W.D.N.Y. 2000).

Despite Mr. Rezaq's extreme deprivation, he has only been provided sham or

meaningless process.  Thirteen years ago, the BOP transferred Mr. Rezaq to the ADX for

reasons that are unknown and unknowable (and have been for at least 10 years, pursuant

to the BOP's document destruction policy).  (*See* Doc. 112 at 13, ¶ 58.)  Even though no

one definitively knows what the original basis for the transfer was, and the BOP therefore

cannot critically assess whether this decision was legitimate, the "reasons" relied on to

place Mr. Rezaq at the ADX have been used as the basis for ongoing determinations to

keep him confined there.  (PSF at 10-11, 19-20, Add'l Facts l, o.)  Defendants purport to

rely on the fact of the transfer itself to justify his placement at ADX.  (*See* Ex. 2, Church

Expert Dep. 102:21-104:11.)  Defendants cite to the unknown "reasons for transfer" in

numerous ways, including justifying his repeated denials from Step-Down by stating that

he had not sufficiently mitigated his reasons for placement in the ADX.  (PSF at 19-20,

Add'l Fact o.)  Apparently concerned that they possess no documentation to justify his

original transfer, Defendants recently instituted a sham proceeding, which they refer to as

an "ADX due process transfer hearing." (*See* Doc. 112 at 3.)  Mr. Rezaq's hearing

resulted in a list of "reasons" for this placement thirteen years after his transfer.

Defendants also have never adequately advised Mr. Rezaq of the factual basis

relied upon to deny him access to Step-Down for twelve years, despite his meeting the

eligibility requirements during that entire period.  (PSF at 19-20, Add'l Fact o.) The

referral notices given to Mr. Rezaq each time he was denied admission to J-Unit (the first

phase of the Step-Down Program) failed to provide him with the factual basis relied upon

to support his denials.  (*Id.*)  Notably, ADX inmates do not even receive notice of the

Step-Down Committee meeting, or an opportunity to present a statement or evidence

prior to the decision.  Rather, they only are provided written notification of the decisions

*after* they have been made.  (Doc. 112 at 52.)  Despite Defendants' contention to the

contrary, there is a material factual dispute as to whether these post-decision notifications

truly provide the "reasons" or factual basis for denial.  (*See Id.*)  Plaintiff asserts that the information contained in these so-called "written notifications" amounts to no more than vague boilerplate statements.  For example on September 11, 2000, Mr. Rezaq received a notice informing him that he was denied placement in Step-Down "due to the circumstances resulting in [his] original designation to the ADX.  Based on the seriousness of the incident, we do not believe those circumstances have been substantially mitigated."  (PSF at 19-20, Add'l Fact o; Ex. 22 at US00431.) This statement in no way reveals the factual basis relied on by Defendants, nor does it advise Mr. Rezaq of what more he could do to be admitted to Step-Down.

1.      **Plaintiff's private interest is significant**

When determining the sufficiency of the process given, the first consideration is the significance of Mr. Rezaq's "interest in avoiding erroneous placement" at the ADX.  *Wilkinson*, 545 U.S. at 225.  "Procedural due process imposes constraints on governmental decisions that deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews*, 424 U.S. at 332.  Notably, the *Mathews* Court points out that duration of the deprivation is an additional factor that affects the private interest: "the possible length of wrongful deprivation…is an important factor in assessing the impact of official action on the private interests."  *Mathews*, 424 U.S. at 341 (finding ten to eleven months was an unconstitutional wait for a hearing regarding benefits).  Further, the Court noted it was more likely to find insufficient process when there was another means of protecting the private interest at issue.  *Id.* at 321.

Mr. Rezaq's liberty interest in not being housed in the restrictive and isolated conditions

at ADX is sufficient to show that his private interest is significant under *Mathews*.   In *Stine v. Lappin*, this Court held that where the plaintiff sufficiently alleged "the deprivation of a liberty interest considering the totality of the conditions," the plaintiff possessed a significant private interest in the potential deprivation of his "constitutional liberty interests, specifically his interest in avoiding placement at the ADX."   *Stine,* 2009 WL 103659 at *11.   Mr. Rezaq's liberty interest is in avoiding his conditions of confinement; thus, he has a significant private interest. Because the Step-Down Program is essentially an inmate's only vehicle for release from the ADX and transfer to a less restrictive facility (Ex. 8 at 14:3-15:21), his private interest is even more significant as he has no alternative means to challenge an unlawful placement.  Further, just as the *Mathews* Court considered the length of the deprivation to be relevant to the private interest inquiry, here too the duration of the deprivation also increases the significance of Mr. Rezaq's interest in not being erroneously placed, as he has been waiting twelve years for meaningful process.  424 U.S. at 341.

> 2.      **The risk of erroneous deprivation of Mr. Rezaq's liberty interest is significant, and the value of additional or substitute procedural safeguards is substantial**

The second factor—the reliability and fairness of the existing procedures, and the probable value of additional process—also weighs in favor of Plaintiff.  The *Mathews* Court notes that, "procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." 424 U.S. at 344.  Central to the evaluation of any administrative process is the nature of the relevant inquiry.  The "requirements of due process are flexible and call for such procedural protections as the particular situation demands." *Wilkinson*, 545 U.S. at 224.

Part of the determination of what processes should be applied requires an analysis of the inquiry itself.  If the inquiry is deemed to be one that is essentially objective because it results from a "sharply focused and easily documented decision," less procedure may be required.  *Mathews*, 424 U.S. at 343 (finding that an inquiry focused a medical determination requires that is generally "routine, standard, and unbiased" requires fewer procedural protections).  However, more procedural protections are required when the decision is more subjective, and where there is "a wide variety of information may be deemed relevant, and issues of witness credibility and veracity often are critical to the decisionmaking process to determine."  *Id.* at 343-44 (internal citations omitted) (finding subjective nature of welfare inquiry required increase in procedural protections).

Courts require several procedural safeguards when evaluating whether a prisoner who has been placed in extreme prison conditions has received sufficient process.  The *Wilkinson* Court identified that inmates must: 1) receive notice of the factual basis relied upon for their placements; 2) be given an opportunity to object and be heard *before* the decision is made; 3) be provided a statement of the reasons for the decision; 4) receive an appeal, or multiple levels of review and 5) continue to receive periodic and *meaningful* reviews assessing the on-going basis for the placement.  *Wilkinson*, 545 U.S. at 226.  (*See also* Doc. 112 at 46-48.)

In *Wilkinson*, the Court observed that it has consistently held that the right to receive notice of the "factual basis leading to consideration for [] placement [in restrictive conditions] and a fair opportunity for rebuttal… are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Wilkinson*, 545 U.S. at

225-26; *see also Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified'" (internal citations omitted); *Sattar v. Gonzales*, No. 07-cv-02698, 2008 WL 5712727, at *3; *Stine v. Lappin*, 2009 WL 103659, at *11. The *Wilkinson* Court required that the notice provided to inmates include a "brief summary of the factual basis for the classification review," which the inmates could then rebut, preventing them from being placed by mistake or "singled out for insufficient reason." *Id.* at 226. Prisoners must have their opportunity to be heard and to rebut the evidence against them *prior* to the decision being made. *Hale v. Ashcroft,* No. 06-CV-00541, 2008 WL 4426125, *6 (D. Colo. Sep. 24, 2008) (emphasizing significance of notice and opportunity to be heard occurring "before the classification was imposed"); *see also DiMarco*, 473 F.3d at 1344.

The Supreme Court has also determined that the decision-maker must provide a statement of reasons informing the inmate of the basis for the decision, to safeguard against arbitrariness. *Wilkinson*, 545 U.S. at 226; *see also Cooper v. Cagle*, No. CIV-06-881-C, 2009 WL 883789, *13 (W.D. Okla. Mar. 30, 2009) (denying summary judgment where "the record is void of any explanation, supported by evidence, as to the reasons for his continued detention in administrative segregation"). These specific reasons provide the prisoner with a basis for objecting to the next decision-maker or at a subsequent review. *Wilkinson*, 545 U.S. at 226. The Court also notes that this disclosure of reasons "serves as a guide for future behavior." *Id.*

Courts have held that the risk of erroneous deprivation is further reduced when multiple

levels of review allow for a decision to be reviewed with the possibility that it can be overturned. *See Wilkinson*, 545 U.S. at 227. These reviews must occur *prior* to the decision becoming final. *Stine*, 2009 WL 103659, at *11 (emphasis added) (pointing out that in *Wilkinson* "[t]he Court was also persuaded that adequate process was provided given that the decision passed through multiple levels of review *prior* to becoming final . . ."). Failure to provide multiple levels of review raises the risk of erroneous deprivation, and is a factor that weighs in favor of a prisoner. *Sattar*, 2008 WL 5712727, at *5.

Finally, the *DiMarco* court found it important that "the prison provided periodic and meaningful reviews of [the Plaintiff's] status, including meetings that DiMarco could attend." *DiMarco*, 473 F.3d at 1344. Similarly, the Court, in denying summary judgment, relied upon the fact that the record did not demonstrate a finding that the "Plaintiff was provided any periodic and meaningful reviews of his continued detention in administrative segregation." *Cooper,* 2009 WL 883789, at *13. The Court held that "[u]nder these circumstances, Plaintiff has presented facts sufficient to demonstrate a violation of his due process rights." *Id.*

Here, Defendants repeatedly assert that Mr. Rezaq was provided with due process through several procedures, including: the December 2009 transfer hearing, progress reports, program reviews, Step-Down reviews, and the administrative remedy program. (*See* Doc. 112, at 2-3.) However, as set forth below, none of these devices actually provided Mr. Rezaq with the basic procedural safeguards required by *Wilkinson*. *See Wilkinson*, 545 U.S. at 225-26. The "reviews" do not provide the bedrock due process requirement of prior notice of the factual basis relied upon, and a fair opportunity to be heard and to object before the decision is made. Furthermore, as discussed previously, as

all of the decisions are based on "reasons" for Mr. Rezaq's transfer that remain unknown, he has never been provided with actual reasons for his repeated denial to the first phase of the Step-Down.  These procedures were merely sham reviews where it was pre-determined that Mr. Rezaq would remain at ADX.

> a.  *Defendants' transfer hearings do not provide Plaintiff with the basic procedural due process requirements*

Mr. Rezaq's December 2009 "transfer hearing" did not meet the requirements of procedural due process.  As an initial matter, the circumstances surrounding the hearing are sufficient for a fact-finder to conclude that the hearing results were pre-determined, and thus, a sham.  Defendants conducted the "transfer hearing" *thirteen years after* Mr. Rezaq was transferred to the ADX, and ten years after his "referral packet" was destroyed.  (Doc. 112, at 3, 13.)  Any information that could foreseeably shed light on Mr. Rezaq's transfer to the ADX would likely have been in his "referral packet," to which the Hearing Administrator did not have access.  (Doc. 112, at 13, ¶ 58.)

The reasons cited by the Hearing Administrator to "support" Mr. Rezaq's placement in ADX further lead to the conclusion that the hearing was based on arbitrarily-concocted, *ad hoc* reasons designed only to justify the BOP's prior action.  (PSF ¶ 87.)  Specifically, one of the listed reasons for his "transfer" to ADX is his one and only incident report—specifically his inability to urinate on command—that was received *after* his placement at the ADX.  (*Id.*)  Plaintiff remains puzzled as to how the other reasons cited for his placement-- his crime of conviction and related information-- can be used to justify his transfer to the ADX as all of that information was available to the BOP when they initially designated Mr. Rezaq to USP Leavenworth.  (*Id.*)  If Mr.

Rezaq's crime of conviction truly warranted placement at the ADX, he would have been transferred there initially, and not to USP Leavenworth. (*See* PSF ¶ 105; Ex. 8 at 73:6-73:16, 87:17-88:13.) This gives rise to the inference that the December 2009 "transfer hearing" is a pre-determined and belated attempt by the BOP to justify its erroneous placement of Mr. Rezaq at the ADX. Thus, even following the "transfer hearing," Mr. Rezaq is left without the reasons for his transfer, and without constitutionally sufficient process to challenge continued placement.

Defendants have chosen to draw attention to the fact that Mr. Rezaq did not participate in the transfer hearing, but fail include all of the facts and circumstances surrounding that hearing. (*See* Doc. 112 at 3.) On December 2nd, when Mr. Rezaq was first informed that Defendants would be conducting a transfer hearing, he informed his case manager that he wanted to consult with his attorneys prior to the hearing. (PSF ¶¶ 88, 108.) In response, she told Mr. Rezaq that the hearing was "not a legal matter." (*Id.*; Ex. C ¶ 27.) Mr. Rezaq chose to not sign any paperwork prior to speaking with his attorneys because he was aware that the hearings could potentially have an effect on his pending litigation. (PSF ¶¶ 88, 103, 108.)

On the day of his hearing, Mr. Rezaq was taken to a phone by his counselor. He told the hearing administrator on the phone that he sent his attorneys the notice of the hearing and that he wanted to consult with them prior to his hearing. At that point, she informed him that he could either have the hearing at that time or be declared a "no-show," and that "it doesn't make any difference." (*Id.*) Mr. Rezaq decided not to proceed without the advice of counsel. (*Id.*) Interestingly, although Mr. Rezaq was told

that the hearing did not concern his counsel, this assertion is belied by the fact that

Defendants rely heavily on it in their Motion for Summary Judgment, thus making it an

issue directly related to this litigation.  (Doc. 112 at 3.)  Plaintiff asserts that these facts

alone may allow a finder of fact to determine that Defendants acted unjustifiably in

providing these belated "transfer hearings."

> b.    *Defendants' Step-Down review procedures do not provide Plaintiff with the basic procedural due process requirements*

Defendants' Step-Down procedures also do not provide Mr. Rezaq with

procedural due process.[9]  Defendants make the bare assertion that the Program Reviews

and Step-Down review procedures provide Mr. Rezaq with sufficient "notice, an

opportunity to be heard, and opportunity to appeal, and an opportunity for periodic

review."  (Doc. 112 at 51.)  Plaintiff disagrees with each of these assertions, and claims

each is a disputed issue of fact.  Regarding the Step-Down reviews, Defendants do not

provide any of the basic procedural protections required by the Constitution.  They fail to

provide notice of Step-Down consideration; they fail to provide an opportunity for the

inmate to be heard; and they fail to provide reasons for the continued retention of

individuals in the extreme conditions at ADX. (*See* PSF ¶ 157 (J-Unit referrals providing

only vague statements); Ex. 8 at 62:23-25 (J-Unit referrals are the only "notice" that is

provided to inmates); Ex. 20 at US02727, ¶ (5)(C)(1)(f) (inmates are not permitted to

---

[9] Similarly, Defendants 3-year progress reports do not reach the level of procedural due process.  The progress reports are created only once every *three years* and provide Mr. Rezaq with no opportunity to be heard or rebut and do not provide for a multi-level review.  The progress reports are completed by the case managers and input is provided "from other unit staff, work detail supervisors, and education instructors;" input is not sought out from Mr. Rezaq when this document is being made.  (*See* Doc. 112 at 15, ¶ 75.)  Defendants' progress reports are quite simply documents that allegedly provide "a detailed, comprehensive account of an inmate's case history during his confinement."  *Id.*

participate in Step-Down reviews).)

Defendants have failed—and continue to fail--to provide prisoners with notice of the Step-Down reviews.  As noted, Mr. Rezaq does not know his reasons for placement; consequently, Step-Down denial notices that he has failed to mitigate those reasons is not adequate explanation.  (PSF at 19-20, Add'l Fact o.)  *See also Ajaj v. U.S.*, 2006 WL 3797871, at *10 (D. Colo. Dec. 22, 2006) (not reported in F. Supp.), *rev'd on other grounds*.  The *Ajaj* court noted that the Step-Down denial notice stating that plaintiff's "reason for placement at the ADX has not been sufficiently mitigated" is "meaningless" without knowing those reasons, and provides an inmate with "notice of nothing").  *Id.* Apparently, Defendants are now arguing that the Program Reviews provide notice of the Step-Down consideration.  (Doc. 112 at 2.)  This assertion is false.  While the Program Reviews *may* consider whether an inmate is eligible for Step-Down, they are otherwise *not* related to the Step-Down consideration and do not even occur in temporal proximity to the Step-Down committee meetings.  (PSF ¶¶ 60-69; Ex. 8 at 12:12-13:9.)

Further, Defendants fail to provide an opportunity for Plaintiff to rebut the information related to the Step-Down committee decision.  First, it is undisputed that Mr. Rezaq does not know when the hearing is to occur, cannot attend, cannot make a statement, cannot call witnesses, and cannot present evidence to the Committee.  (Ex. 20 at US02727, ¶ (5)(C)(1)(f).)  Second, even *if* he were able to meet with the Committee, it remains unclear what factors are actually assessed when they make the decision to deny or admit an inmate into the various phases of the Step-Down Program.  (PSF ¶ 120; Doc. 112 at 28, ¶ 153.)  The vagueness and ambiguity of Defendants' process would prevent—

even if the opportunity existed—Mr. Rezaq from challenging the reasons relied upon by the Committee, as he simply does not know what those reasons are.  (PSF ¶ 157.)

Accordingly, the Step-Down process is unreliable and unfair, and Mr. Rezaq, who has continuously attempted to conform his behavior to Defendants' professed requirements, was denied admittance to the first phase of the Step-Down Program, the J-Unit, for over twelve years.  (PSF at 19-20, Add'l Fact o.)  Even when Mr. Rezaq *was* admitted, the basis for that decision was not provided.  (Ex. 7 at 10:25-11:18; *see also* Ex. 24.)  Providing inmates with factors that are actually assessed during Step-Down reviews and that equate with appropriateness for advancement to the next phase would make the process reliable and fair to inmates who are attempting to comply with Defendants' standards.  As Plaintiff will continue to be assessed for advancement through Step-Down under the same arbitrary standards that have been used thus far, it is very likely that he may remain indefinitely in various phases of the program, without being provided a reason, and through no fault of his own.  (PSF ¶ 120; Ex. 8 at 93:11-94:11.)

c.  *Defendants' program reviews do not provide the basic procedural due process requirements*

Despite Defendants' assertions, the program reviews themselves also do not provide Mr. Rezaq with procedural due process.  (Doc. 112 13, ¶ 60.)  As an initial matter, it is impossible for the program reviews to provide sufficient process as they have no bearing on Mr. Rezaq's housing placement, or his progression to the Step-Down program.  (Doc. 112 at 14, ¶¶ 65, 67.)  The program reviews are supposedly semi-annual team meetings, not only for prisoners at ADX, but for every prisoner in the BOP.  (Doc. 112 at 14, 67-68.)  Although Mr. Rezaq is occasionally present during these meetings, he

is often just sent the results, and he is never provided with a *meaningful* opportunity to be heard regarding his housing or placement at ADX.

The team meetings or program reviews are used to discuss his programming, which educational TV programs he should watch, and his recent conduct. (Doc. 112 at 14, ¶¶ 65, 67, 68.) The program reviews appear to be a simple "check in" and generally only last for around *two to three minutes*. (PSF ¶ 62.) During the times that Mr. Rezaq did raise his concerns related to not previously being admitted to the program, he was given general responses such as "just keep doing what you've been doing" and was told by his Unit Team that they were unable to do anything about whether he was placed in Step-Down, and that their role was only to document his eligibility for consideration for Step-Down. (PSF ¶¶ 62, 73.) Furthermore, the team "meetings" often do not occur at all. (PSF ¶ 62.) According to Mr. Rezaq, during his last three program reviews, he did not actually meet with his Unit Team; instead, each time a BOP staff member brought his program review report to his cell and requested that he sign it. (*Id.*)

> d.   *Defendants' administrative remedy program does not provide Plaintiff with the basic requirements of procedural due process*

Like the other *ad hoc* proceedings that Defendants provide, the administrative remedy program is not constitutionally sufficient.[10]  Defendants assert that the

---

[10] Plaintiff is also not provided with a multi-level review before a final decision related to Step-Down is made. In Defendants' Motion for Summary Judgment, they appear to hint that their Program Reviews in combination with the current Step-Down review procedure and their administrative remedy program amounts to multiple levels of review. (Doc. 112 at 51-53.) However, the Program Reviews cannot reasonably be considered to provide Mr. Rezaq with procedural due process, let alone be considered the first level of a multi-level review process. The Unit Team has no substantial involvement in the decision to allow an inmate to participate in the Step-Down program. The Unit Team only forwards a list of all of the eligible inmates to the

administrative remedy program provides multi-level review and an opportunity to rebut the reasons for a decision. Doc. 112 at 52-53. However, the administrative remedy program does not provide sufficient opportunity to rebut evidence concerning a Step-Down decision as it fails in two respects: first, any opportunity to rebut only occurs *after* the decision has taken place, and second, the reasons provided remain so vague that an inmate cannot legitimately rebut them. (PSF ¶ 157.) As discussed above, without an opportunity to rebut the reasons before a decision is made, this bedrock procedural requirement is not satisfied. *See Wilkinson*, 545 U.S. at 226; *see also Cooper v. Cagle*, 2009 WL 883789, at *13. Additionally, as discussed at length above, the failure of the BOP to provide sufficiently detailed reasons prevents Mr. Rezaq from being able to legitimately rebut the reasons for his placement in such restrictive conditions. (PSF at 10-11, Add'l Fact l.)

Further, even if adequate reasons for Mr. Rezaq's Step-Down determinations were to be provided, Plaintiff disputes the effectiveness of the Bureau's administrative remedy program. Mr. Rezaq has used the administrative remedy program for various reasons and the use of this program has never resulted in a positive resolution of any of his concerns regarding Step-Down. (PSF ¶ 160.) In fact, Associate Warden Fox testified

---

Step-Down Committee who then determines whether or not participation in the Step-Down Program is appropriate. (Ex. 8 at 12:12-13:9.) The Committee is essentially the only level of "review" for the Step-Down program. The Committee members, including the ADX Warden, make the ultimate decision as to whether or not an inmate should begin or continue participation in the program all in the same meeting. (Ex. 8 at 40:14-20.) Although the Warden has the sole discretion to override the rest of the Committee, his decision is made within the same meeting as the rest of the Committee members. *Id.* at 40:18-41:2. Further, the Bureau's administrative remedy program is a completely distinct and separate device from the Step-Down program.

that he has never known of any inmate's use of the administrative remedy program to result in an overturning of the Committee's decision to deny an inmate's advancement in the Step-Down program.  (*Id.*; Ex. 8 at 96:3-96:24.)  When Mr. Rezaq did use the administrative remedy program to dispute his repeated denials to participate in the Step-Down Program, he received only vague statements that merely mimicked the language of the denial itself.  (Ex. 24, Selected Rezaq Admin. Remedies, at US01942 ("placement in the program would jeopardize the orderly running of the facility"), US02226 ("the conduct which warranted your placement at the ADX had not yet been sufficiently mitigated.")

Additionally, the *Sattar* Court found that the Bureau's administrative remedy is not "all that is required" to satisfy procedural due process.  *Sattar*, 2008 WL 5712727, at *4.  "[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Id.*  As the administrative remedy process necessarily follows a decision, it does not provide Mr. Rezaq with the opportunity to be heard at a meaningful time or in a meaningful manner.

Defendants' Step-Down review procedures are not fair, reliable nor meaningful.  It is unfathomable that Defendants can contend that a process that results in entirely inexplicable decisions, even to its own decision-makers, is a meaningful one.  (*See* Ex. 7 at 10:25–11:18.)  It also cannot be said to be fair or reliable to assess inmates, for Step-Down, using mysterious and hidden factors.  (*See* Doc. 112 at 51 "[W]here an inmate is held in segregation for a prolonged or indefinite period of time due process requires that his situation be reviewed periodically in meaningful way . . ." *Toevs*, 2009 WL 598258,

at *8.  Defendants' transfer hearing, program reviews, Step-Down reviews, and administrative remedy program amount to nothing more than sham proceedings and cannot legitimately be perceived as providing adequate procedural due process.  *See Id.*

### 3.      The Government's Interest Does Not Outweigh the First Two Factors

Finally, sufficiency of process must balance the government's interest in taking the challenged action with the potential burdens of adopting the suggested procedural safeguards. The balancing informs a determination as to when judicial procedures must be imposed upon administrative action to assure fairness.  *Mathews*, 424 U.S. at 348.  This Court has held that when the first two *Mathews* factors weigh in favor of the plaintiff, the government interest factor may be overcome.  *See Stine,* 2009 WL 103659, at *11 (finding that, although the government had a significant interest in managing its prison facilities and maintaining order among its staff and inmates, government's interest was outweighed by the private interest and the risk of erroneous deprivation); *see also Sattar,* 2008 WL 5712727, at *5-6 (finding that the two factors in Plaintiff's favor sufficiently outweighed the government's interest to survive motion to dismiss.)  Moreover, in cases where courts have held that safety concerns outweigh the other *Mathews* factors, the prisoner-plaintiff has had a history of violence and misconduct *while incarcerated*.  *See Shoats v. Horn*, 213 F.3d 140, 141 (3rd Cir. 2000).

In Mr. Rezaq's case, the additional process proposed, relating specifically to more effective notice, including intelligible and specific factual bases for Step-Down determinations, outweighs the minor costs of providing that process.  Acknowledging the limited resources available to the government for operating prisons, "elaborate procedural safeguards" are not sought in this case.  *See Wilkinson*, 545 U.S. at 228 (allowing inmates to call witnesses or

provide other procedures resembling an "adversary hearing" are unnecessarily elaborate

safeguards).  Although providing a more specific explanation of reasoning may impose a slightly

more lengthy drafting of the individualized notice, such a time consideration cannot be much

where the very reasons to be disclosed were discussed among the members of the Step-Down

Committee immediately prior to drafting the notice.  (Ex. 8 at 93:11-94:11.)  Additionally, Mr.

Rezaq asserts that the existence of possible *illegitimate* reasons for his ongoing detention at ADX

should be considered—to determine that these are not the reasons receiving deference—under

this analysis.  (PSF ¶ 66; PSF at 10-11, Add'l Fact l.)

In conclusion, Mr. Rezaq's private interest in being housed in a less restrictive

facility, as well as the overwhelming evidence of the BOP's failure to provide basic due

process protections, weigh in favor of Mr. Rezaq's challenge to the constitutional

sufficiency of Defendants' processes related to their transfer hearing, program reviews,

Step-Down reviews, and administrative remedy program.

**D.  Plaintiff's Due Process Claim, Based in His Conditions of Confinement Today and For the Past 13 Years is Not Moot.**

For past thirteen years, the BOP has confined—and continues to confine—Mr. Rezaq

under extremely restrictive conditions that are atypical, and significantly harsher, than those of

other prisoners.  The isolation and restrictive conditions he has endured are so severe that they

establish a liberty interest for Mr. Rezaq in being free from them.  While Defendants ground

their position in the conditions in J-Unit, this emphasis is misleading, as the conditions in J-Unit

are virtually identical to those in GP.  Thus, Mr. Rezaq's significant and atypical hardship in his

current placement is merely a continuation of thirteen years of hardship.

Mr. Rezaq's transfer to J-Unit does not diminish his cognizable interest in achieving

transfer to a less restrictive facility via participation in Step-Down.  Mere admission to the first phase of the Step-Down Program does not provide this relief, which remains necessary and available.  Mr. Rezaq maintains a continuing interest in his claim until such time as he completes Step-Down and achieves transfer to a less-restrictive facility.  In essence, Plaintiff's current due process claim relates to both the process for *admission into* Step-Down, as well as the process governing an inmate's *progression through* each phase of Step-Down, ultimately resulting in transfer out of the ADX to a less-restrictive facility.

Finally, the BOP's conduct in placing Mr. Rezaq into Step-Down falls squarely within the voluntary cessation exception to the mootness doctrine.  Even if the minor changes in J-Unit alter the liberty interest analysis, Mr. Rezaq's claim regarding his GP conditions is not moot, as it is undisputed that at any moment, for any reason or no reason at all, and without a hearing or any explanation, Mr. Rezaq could be returned to GP for an indefinite amount of time.  As such, Mr. Rezaq's claim is not moot, and the conditions in GP continue to inform the issues in his case.

    1.   **Mr. Rezaq's Claim Relates Not Only to Admission to Step-Down, But Also to Progression Through the Program, and As Such He Maintains a "Continuing Interest" in the Controversy**

Defendants assert that Mr. Rezaq's claim is moot because (1) "he can show no constitutional violation," and (2) "because he is not entitled to any additional process."  (Doc. 112 at 59-60.)  Neither of these reasons is grounds for mootness, but rather are arguments on the merits of the claim.  Nevertheless, within their mootness discussion, Defendants also allude to Mr. Rezaq's transfer to J-Unit as satisfaction of one of his requests for relief.  (*Id.* at 59.)  For the reasons set forth below, Mr. Rezaq's claim is not moot as a result of this transfer and injunctive relief may still be granted.

The U.S. Supreme Court has held that a plaintiff's "continuing interest" in a case may overcome an assertion of mootness. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 192 (2000); *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007). The Court urged that "[t]o abandon the case at an advanced stage may prove more wasteful than frugal," but found that it is appropriate to dismiss "cases in which one or both of the parties plainly lack a continuing interest, as when the parties have settled or a plaintiff pursuing a nonsurviving claim has died." *Friends of the Earth*, 528 U.S. at 191-92.

Mr. Rezaq's harm can only be remedied by his completion of Step-Down and subsequent transfer to a less-restrictive facility. Mr. Rezaq's claim regarding "participation" in Step-Down is not moot, as it challenges the *ongoing* harm caused by an insufficiency of process from the moment of his transfer to the ADX through the present. On a basic level, the term participation means "a taking part." WEBSTER'S II NEW COLLEGE DICTIONARY 801 (Houghton Mifflin Co. 1995). The term connotes an active and temporally broad action, rather than a single moment of a change. Step-Down does provide progressively less-restrictive conditions, such that entrance alone is not an end in itself. Thus, because (1) Mr. Rezaq seeks transfer to a USP, and (2) "participation" in Step-Down involves working *through* Step-Down, rather than mere admission thereto, Mr. Rezaq's claim is not moot.

Mr. Rezaq's Step-Down claim is clearly ongoing, as the same procedures that determined his admission will be applied going forward to assess his advancement through, as well as his potential removal from, Step-Down. (PSF ¶ 120.) Notably, the Committee reviews that assess an inmate's progression from one phase of Step-Down to the next consist of the same process that determined his initial admission to the Program. (*Id.*) This "process" will include: (1) an

extraordinary level of discretion by the Warden, without accountability or a duty to explain

reasons for his decision-making (*see* PSF at 19-20, Add'l Fact o), (2) ambiguous notices

provided for both denial and admission that do not communicate any guidance for his behavior,

(*id.*), and (3) consideration by the Committee in the span of less than five minutes of factors

whose definition is constantly amended in the frequent evolutions of the ADX's own Institution

Supplement.  (PSF ¶¶ 122, 147-48.)

 One significant area of dispute regarding the Committee's process is the BOP's reliance

on Mr. Rezaq's "reasons for placement" at the ADX, which Plaintiff maintains have never been

fully communicated to him.  As an initial matter, Defendants have submitted conflicting

evidence regarding whether Mr. Rezaq has sufficiently mitigated his reasons for placement. (PSF

¶ 149; Ex. 7 at 18:20-24.)  Further, there remains a material dispute as to whether these reasons

for placement are known, and, if so, what they are.  In light of these conflicts, it is impossible to

know how the "reasons for placement" will continue to impact Mr. Rezaq's Step-Down

progression in the future. Per BOP policy, it is undisputed that the Committee, when examining

Mr. Rezaq's placement, will continue to evaluate his "reasons for placement at the ADX" (PSF ¶

121); thus the risk of reliance on these unknown facts remains as present today as when he was

in GP.

 Moreover, the full process of progressing through Step-Down lasts, at the very least,

three years, spanning three different housing units and involving, at the least, four reviews by the

Committee and ADX warden. Associate Warden Fox has testified that this three-year minimum

for progressing through Step-Down is an unlikely timeline that has never been achieved and that

many inmates move forward and backward through phases of the program and GP indefinitely.

(PSF at 19, Add'l Fact m.) Defendants admit that there is the potential for ADX staff to keep an inmate in Step-Down for decades without ever transferring him to another facility, or to repeatedly remove and re-admit an inmate into the program forever. *Id.*

In light of the twelve years when Mr. Rezaq was continually denied admission to Step-Down under the same review process, there is absolutely no assurance that he will ever successfully *complete* Step-Down, even if he continues to meet all of the eligibility requirements and maintain his exemplary conduct. In light of these circumstances, Mr. Rezaq's claim is not rendered moot by his admission to J-Unit when his participation in Step-Down has only just begun.  Therefore, the validity of the existing process safeguarding Mr. Rezaq's liberty interest remains in controversy despite Mr. Rezaq's relocation to a separate wing of the building.

### 2. Defendants' Conduct in Admitting Mr. Rezaq to Step-Down Constitutes Voluntary Cessation, Excepting Mr. Rezaq's Claim from Dismissal for Mootness.

If this Court finds that the "admission" portion of Mr. Rezaq's Step-Down participation claim has been resolved, Plaintiff urges that the mootness exception of voluntary cessation nevertheless preserves the justiciability of that claim as it relates to GP conditions.  Throughout an inmate's progression through each phase of Step-Down, he faces the constant looming possibility of returning to GP, even absent any misconduct or failure on his own behalf. (PSF at 19, Add'l Fact n.) The BOP voluntarily admitted Mr. Rezaq into the program following the instigation of this lawsuit.  The BOP has been unable to provide an explanation of a change in circumstances that would substantively rationalize that admission to provide assurances that the motive was anything other than to achieve dismissal of Mr. Rezaq's claim, after which they may return him to GP at will.  (PSF ¶¶ 123, 125-26.)

Even if the move to J-Unit were capable of mooting Plaintiff's claim, the doctrine of voluntary cessation compels this Court to retain jurisdiction over this matter.  It is well-settled that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of a practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc*., 455 U.S. 283, 289 (1982)).  "Voluntary cessation does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior **could not reasonably be expected to recur**.'" *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 719 (2007) (emphasis added) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189). "[T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct." *U.S. v. W.T. Grant Co*., 345 U.S. 629, 897 (1953).  Otherwise, the defendant would be "free to return to his old ways." *Id*. at 632.

In accordance with this principle, the party asserting mootness bears the "heavy burden" of persuading the court that there is no reasonable expectation the challenged conduct will be repeated.  *Friends of the Earth*, 528 U.S. at 708; *ARW Exploration Corp. v. Aguirre*, 947 F.2d 450, 454 (10th Cir. 1991).  Defendants cannot meet that burden here.  Moreover, this Court recently held that the ADX's ability to remove an inmate from Step-Down constitutes voluntary cessation. *Saleh v. Fed. Bureau of Prisons*, Slip Copy, No. 05-CV-02467, 2009 WL 3158120, at *6-7 (D. Colo. Sep. 29, 2009).

As outlined above, a return to GP is more than reasonably likely to recur, as it has recurred time and time again with other ADX inmates in the past. (PSF at 19, Add'l Fact n.) *See also Saleh*, 2009 WL 3158120 at *6-7.  When asked directly what had suddenly persuaded the

Committee to admit Mr. Rezaq into Step-Down, Associate Warden Fox was unable to identify any specific reasons for the sudden change after 12 years of denial, eventually testifying that the "passage of time" had simply alleviated the Committee's concerns. (PSF ¶ 120.) Despite his admission, however, the BOP retains total authority to remove Mr. Rezaq from the program and place him back in GP at any moment. (PSF at 19, Add'l Fact n.)

Defendants have the burden on this issue but are unable to assure Mr. Rezaq or this Court that his removal from Step-Down and return to GP will not recur. (Doc. 112, Def.'s Statement of Undisputed Material Facts ("SUMF") ¶¶ 148-49; PSF ¶ 149.) Documents as well as deposition testimony reveal that, historically, the warden's decision has often opposed the Committee recommendations both by admitting those recommended against, and denying those recommended for, the program. (PSF ¶ 119.) The same review process related to Step-Down admissions is applied to inmates as they progress through each phase of the program, and the warden maintains his sole discretion as to both advancement through each phase and the ability to remove the inmate from the program. (PSF at 20-21, Add'l Fact q.) In fact, Warden Wiley testified in his deposition that he had the "authority to remove an inmate from USP D/B," the last level of Step-Down, and place him back in the ADX any day. (Ex. 21 at 61:4-63:8.) Notably, this unbridled discretion by the Warden is not accompanied by notice of reasons to either the inmate or the Committee members. (PSF ¶ 151.) Mr. Rezaq's return to GP could occur at any time without reason or opportunity to challenge it. (PSF at 19, Add'l Fact n.) His admission to Step-Down and subsequent removal could, in fact, occur endlessly for the remainder of Mr. Rezaq's sentence under the current system. It is precisely this type of conduct that the voluntary cessation doctrine was meant to protect against. *See Saleh*, 2009 WL 3158120 at *6-7.

Because Defendants have failed to provide any assurance that Mr. Rezaq's admission to Step-Down is anything other than temporary and diversionary, they have failed to meet their heavy burden to show that their voluntary cessation of the prohibited conduct will not resume if Plaintiff's claim is dismissed. Consequently, this Court should retain jurisdiction over this claim.

### E.  Mr. Rezaq's Requested Injunctive Relief is Appropriate

#### 1.  Defendants Err in Concluding That No Constitutional Violation Has Occurred

Defendants also argue that Mr. Rezaq has received constitutionally sufficient process regarding his confinement in the ADX, both in terms of his initial transfer there and his subsequent Step-Down reviews. As Plaintiff has discussed in detail above, such assertions are clearly overstated. Although the BOP has provided what they refer to as a "hearing" regarding Mr. Rezaq's transfer, both the timing and factual basis relied upon in that hearing expose it to be a sham, designed merely to affirm the unfounded determination made thirteen years ago; a determination for which there is no original documentation due to its destruction by Defendants ten years ago.

#### 2.  An Injunction Assuring Plaintiff of Transfer to a Less-Restrictive Facility Is Appropriate Under the PLRA's Relief Restrictions

Defendants' mootness assertion is further based in the PLRA's limitations upon available relief, including the unavailability of relief for *past* violations and the requirement that relief be narrowly tailored to a particular inmate. (Doc 112 at 58.) As outlined above, Mr. Rezaq's claim remains active, such that the relief sought is in fact prospective in light of an ongoing constitutional violation and therefore does not run afoul of the PLRA requirements in that regard. Further, contrary to Defendants' assertions, Plaintiff urges that injunctive relief in the form of transferring Mr. Rezaq to a less-restrictive facility would satisfy the PLRA's narrowness

65

requirement.  Indeed, the transfer would allow relief that does not require ongoing Court monitoring, whereas an order to progress Mr. Rezaq through Step-Down might be before this Court for years into the future. Therefore, the limitations of the PLRA are satisfied and provide no support for dismissal of Mr. Rezaq's claim on grounds of mootness.

**CONCLUSION**

In sum, numerous material factual disputes material to Plaintiff's claims exist, rendering summary judgment inappropriate.  Accordingly, Plaintiff respectfully requests that this Court deny Defendants Motion for Summary Judgment.

DATED:          January 14, 2010

Respectfully submitted,

STUDENT LAW OFFICE

s/ Laura L. Rovner
Laura L. Rovner, Esq.
Brittany Glidden, Esq.
Kim Chavez Cook, Student Attorney
Olawunmi Ogunwo, Student Attorney
University of Denver College of Law
2255 E. Evans Avenue
Denver, CO  80208
Tel:  303.871.6140
Fax:  303.871.6847
Email:  lrovner@law.du.edu

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of November, 2010, I electronically filed the foregoing PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

Juan Villasenor

juan.villasenor@usdoj.gov

_____ /s/ Laura L. Rovner_____

Laura L. Rovner