IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  07-cv-02483-LTB-KLM

OMAR REZAQ,

      Plaintiff,

v.

MICHAEL NALLEY,
BLAKE R. DAVIS,
ERIC HOLDER,[1] and
FEDERAL BUREAU OF PRISONS,

      Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN  L. MIX**

      This matter is before the Court on **Defendants' Motion for Summary Judgment**
[Docket No. 112; Filed December 24, 2009] (the "Motion").  Plaintiff filed a Response on
January 14, 2010 [Docket No. 123], and Defendants filed a Reply on January 28, 2010
[Docket No. 133].  Thereafter, Defendants sought leave to supplement their Motion to
address a supplemental claim added to Plaintiff's case (the "Supplement").  Leave was
given, and the Supplement was docketed on May 17, 2010 [Docket No. 147].  Plaintiff filed
a Supplemental Response on June 7, 2010 [Docket No. 148], and Defendants filed a
Supplemental Reply on June 28, 2010 [Docket No. 152].  The Motion and Supplement have
now been fully briefed.

      Pursuant to 28 U.S.C. § 636(b)(1) and D.C.COLO.LCivR 72.1.C., the dispositive

_____

[1] Pursuant to Fed. R. Civ. P. 25(d), Defendants Davis and Holder are automatically
substituted as Defendants because they are the current Warden of ADX and the Attorney
General of the United States, respectively.

issues raised in the Motion and Supplement have been referred to this Court for recommendation. Having considered the pleadings, the case file, and being fully advised regarding the issues, the Court recommends that the Motion and Supplement be **GRANTED**.

## I. Factual and Procedural Background[2]

Plaintiff Omar Rezaq filed a federal lawsuit to address his incarceration at the United States Penitentiary, Administrative Maximum Prison in Florence, Colorado ("ADX"). He is serving a life sentence for air piracy. Prior to his conviction, Plaintiff was a member of several military and terrorist groups, including the Palestinian Liberation Organization, Intifada and the Fatah Revolutionary Council. *Plaintiff's Deposition* [#112-1] at 13-28. As a member of the Fatah Revolutionary Council, Plaintiff was selected to hijack an Egyptian airplane. *Id.* at 60. Fifty-seven passengers, including at least one American, died as a result of the hijacking. *United States v. Rezaq*, 134 F.3d 1121, 1125 (D.C. Cir. 1998).

After his conviction, Plaintiff was initially incarcerated at the United States Penitentiary in Leavenworth, Kansas ("USP-Leavenworth") for less than two months prior to his placement at ADX. *Complaint* [#19] ¶¶ 20-33; *Collins' Declaration* [#112-2] at 2. At the time of the Complaint's filing, Plaintiff had been confined in the general population unit at ADX since January 1997. *Complaint* [#19] ¶¶ 33, 36. After the filing of the Complaint, Plaintiff was transferred to a marginally less-restrictive unit at ADX known as the "J Unit," where he was housed at the time of the Motion's filing. *See Motion* [#112] at 23. By the

---

[2] The background facts are primarily taken from the Complaint and my earlier Recommendation on the Motion to Dismiss. The Court will discuss the relevant disputed and undisputed facts where necessary in the analysis of Plaintiff's claims.

time of the Supplement's filing, however, Plaintiff had been transferred to an even less-restrictive unit at ADX known as the "K Unit," where he apparently remains. *See Supplement* [#147] at 5. Plaintiff's movement to different units is authorized as a result of his recent admittance to the Step-Down Unit Program. *See Motion* [#112] at 22-24. At ADX, in order to move from the general population unit to a less-restrictive housing assignment – i.e., the intermediate unit (J Unit), the transitional unit (K Unit), and the pre-transfer unit – an inmate must be enrolled in the Step-Down Unit Program (or "Program"). *Complaint* [#19] ¶¶ 69-71; *2009 ADX Step-Down Unit Policy* [#112-3] at 21-33.

Enrollment in the Program is significant because it is one of the vehicles by which an inmate can later be moved from ADX to a less-restrictive facility. *Collins' Declaration* [#112-2] at 7. However, transition between the levels of the Program is not automatic, in that an inmate must satisfy certain criteria to be eligible to do so. *See id.* at 7-8. Despite the fact that Plaintiff claims that he was eligible for enrollment in the Program since "completing his first year in the General Population Unit at ADX," he was not enrolled until September 21, 2009, nearly thirteen years after his transfer to ADX. *Complaint* [#19] ¶ 69; *Collins' Declaration* [#112-2] at 13.

As an inmate incarcerated in the general population unit at ADX, Plaintiff's conditions were restrictive. *Complaint* [#19] ¶¶ 38-45; *Collins' Declaration* [#112-2] at 8-9; *Plaintiff's Declaration* [#148-10] at 1-5. He was confined alone to an 87.5 square foot cell for at least 23 hours per day. The location of Plaintiff's cell prevented him from experiencing direct sunlight, but did provide natural lighting. He ate his meals alone in his cell, and when he was allowed recreation, he was required to recreate alone both indoors and outdoors. He showered alone in his cell. When he was transported from his cell, he was escorted in

3

handcuffs and shackles. He was allowed two, 15-minute phone calls and up to five social visits per month.

As an inmate incarcerated in the J Unit at ADX, Plaintiff's conditions continued to be restrictive. *Collins' Declaration* [#112-2] at 9; *Plaintiff's Declaration* [#123-3] at 5-6. He was confined alone to a 75.5 square foot cell for at least 22.5 hours per day. His cell location continued to prevent him from experiencing direct sunlight, but did provide natural lighting. He recreated in an indoor common recreation area specific to his range (i.e., the part of the prison in which he resided) and alongside other inmates who were housed on that range. He continued to recreate alone while outside, but could talk to other inmates who were also recreating outside. While he continued to eat alone, he picked up his meals in the range, rather than having his meals brought to him in his cell. He showered in a common area, which accounted for the difference in cell size between his general population unit cell and his J Unit cell. When he was allowed to leave his cell, he was unrestrained while on the range. While on the range, he could converse with as many as seven other inmates on the range. He was allowed three, 15-minute phone calls and up to five social visits per month.

Plaintiff, who is represented by counsel, has two remaining claims:

Primary Claim        Plaintiff has a liberty interest in avoiding the conditions of confinement at ADX without procedural due process, *Order* [#58] at 1; and

Supplemental Claim        Plaintiff's December 2009 hearing to address the reasonableness of his 1997 transfer to ADX did not comply with the requirements of due process, *Order*

[#144] at 4.[3]

Plaintiff seeks declaratory and injunctive relief regarding Defendants' alleged violations of his Fifth Amendment rights. *Complaint* [#19] at 16-17. He also seeks reasonable attorney fees, expenses, and costs. *Id.* at 17. Plaintiff names as Defendants the Federal Bureau of Prisons ("BOP"); Eric Holder, U.S. Attorney General; Michael Nalley, Regional Director of the North Central Region of the BOP; and Blake R. Davis, Warden of ADX. The individually-named Defendants are sued in their official capacities only. *Id.* ¶ 8.

## II. The Motion and Supplement

As noted above, Defendants filed a Motion and Supplement seeking summary judgment in their favor. The gist of both pleadings is that because Plaintiff has no liberty interest in avoiding the conditions of confinement at ADX, either in the general population unit or J Unit, he was not entitled to due process regarding his placement there. Plaintiff disputes that his conditions do not implicate a liberty interest. Defendants also argue that to the extent that a liberty interest is implicated, Plaintiff has received sufficient process. This contention is hotly contested by Plaintiff. Both parties spend a great deal of their efforts discussing the process that Plaintiff has received and arguing whether it has been

_____

[3] A related claim challenging Plaintiff's 1997 transfer was dismissed as time barred because Plaintiff failed to raise a challenge to his transfer within the applicable statute of limitations. *Order* [#58] at 1; *Recommendation* [#57] at 7-9 However, in December 2009, Defendants provided Plaintiff with a retroactive hearing to determine the reasonableness of his 1997 transfer to ADX. Accordingly, I granted Plaintiff leave to supplement his Complaint to assert a new claim regarding the process that he received at his 2009 hearing. *Order* [#144] at 3-7. Although the facts surrounding the 2009 hearing have been labeled as a "new claim" by the parties and the Court, in reality, these facts are an extension of Plaintiff's primary claim about his continued placement at ADX, allegedly without due process. To the extent that the Court considers the process that Plaintiff received and its timing, I do so in relation to whether Plaintiff has a liberty interest in avoiding the conditions at ADX generally and, if so, whether the process that he has received from the time of that placement up to and including the December 2009 hearing has been sufficient.

sufficient.

## III. Analysis

### A.    Standard of Review

Summary judgment is proper when the record before the court "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if the outcome could be decided in favor of either party. *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994). A fact is "material" if it could reasonably affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the movants do not bear the ultimate burden at trial, as is the case here, they need only satisfy the initial burden of demonstrating the absence of evidence to support the nonmovant's case. *In re Ribozyme Pharm. Inc. Sec. Litig.*, 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002). Once the motion has been properly supported, the burden shifts to the nonmovant to show the existence of a genuine dispute of a material issue. The nonmoving party must go beyond the allegations in his pleading and provide "specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To satisfy his burden of providing specific facts, the nonmoving party must tender affidavits or other competent evidence. *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The factual record and inferences therefrom are generally viewed in the light most favorable to the nonmoving party. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998). However, to be entitled to preferential review, the nonmoving party must respond with competent evidence and cannot support his arguments on the basis of conclusory, speculative, or inadmissible statements. *Bones v. Honeywell, Int'l,*

*Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

Finally, although the Court must construe the filings of a *pro se* litigant liberally, *see Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), Plaintiff is not proceeding *pro se*. Accordingly, deferential review of his pleadings does not apply.

### B.    Due Process Generally

Plaintiff equates his conditions of confinement at ADX to those that an inmate may expect to encounter when serving time in administrative segregation at another facility. *See generally Complaint* [#19] at 5-8. In general, "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). In *Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995), however, the Supreme Court held that restrictive conditions may implicate a liberty interest protected by the due process clause if they "impose[] [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See also Wilson v. Jones*, 430 F.3d 1113, 1120-21 (10th Cir. 2005).

To state a Fifth Amendment due process claim, a plaintiff must allege facts that satisfy two elements. *See Bartell v. Aurora Pub. Schs.*, 263 F.3d 1143, 1149 (10th Cir. 2001). First, he must show that he possesses a protected liberty interest. *See id.*; *Veile*

*v. Martinson*, 258 F.3d 1180, 1184-85 (10th Cir. 2001).  The liberty interest factor is a threshold issue.  *Templeman v. Gunter*, 16 F.3d 367, 371 (10th Cir. 1994) (noting that without a liberty interest, "no particular process [is] constitutionally required").  Second, if the threshold issue is satisfied, he must show that he was not afforded the appropriate level of process.  *See Bartell*, 263 F.3d at 1149.  Here, Defendants argue that Plaintiff's conditions do not implicate a liberty interest.  In the alternative, Defendants contend that Plaintiff received sufficient process.

### C.    Preliminary Matters

Almost as an afterthought, Defendants argue that Plaintiff's claims are moot because he has been transferred out of the general population unit and admitted to the Step-Down Unit Program.  *Motion* [#112] at 59.  Further, Defendants argue that because Plaintiff has been provided with additional process since the filing of his Amended Complaint, he has been provided with more than sufficient process.  *Id.* at 60.  Defendants' unilateral decision to provide additional process to Plaintiff does not render his claims moot, because the sufficiency of that process is a disputed legal issue in this case.  *See Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) (noting that "[t]he burden of demonstrating mootness 'is a heavy one,'" and holding that case is not moot unless "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation").  Here, Plaintiff disputes that the intervening hearing satisfied the requirements of due process.  In addition, the Court notes that the heart of Plaintiff's request for relief is for transfer to a less-restrictive facility.  This remedy has not been provided to him and, therefore, prospective relief remains available.  While Defendants argue that Plaintiff may not ultimately be entitled to this form of relief, Plaintiff's request for relief remains

appropriate for judicial review.[4]

In addition, while the Court notes that Plaintiff has now been admitted to the Step-Down Unit Program, his entry into the Program does not render his claim moot because it is not irrevocable. Upon resolving an identical issue, a court in this District held that BOP's voluntary cessation of its conduct only serves to moot a claim if it can satisfy the "'heavy burden' of showing that 'it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Saleh v. BOP*, No. 05-cv-02467, 2009 WL 3158120, at *6 (D. Colo. Sept. 29, 2009) (unpublished decision) (quoting *Friends of the Earth, Inc. v. Laidlaw Environ. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). Because admission to the Step-Down Unit Program can be revoked on a variety of bases, Plaintiff could be restored to his previous position and unit without consideration of whether he has been provided due process. *See generally Wiley's Deposition* [#123-20] at 62-63, 128-30. In these circumstances, Defendants cannot meet their heavy burden of demonstrating mootness. *See Saleh*, 2009 WL 3158120, at *6. In addition, I credit Plaintiff's argument that mere admission to the Step-Down Unit Program does not satisfy his request for relief; rather, he seeks the opportunity to participate fully in the Program and ultimately to successfully complete it and to be transferred out of ADX. *See Response* [#123] at 3–4. This opportunity has not yet been provided to him given the multiple phases through which

---

[4] Specifically, to the extent that Defendants argue that Plaintiff is prohibited from receiving a transfer out of ADX by the Prison Litigation Reform Act ("PLRA"), see *Motion* [#112] at 58-61, the Court rejects their contention. While the PLRA instructs the Court to employ the least-invasive remedy, it does not specifically preclude transfer as a remedy for Plaintiff in appropriate circumstances. *See* 18 U.S.C. § 3626(a)(1)(A). Particularly given that Plaintiff is now in the K Unit and may be moved to the pre-transfer unit in the near future, it is unclear what lesser remedy other than transfer is still available to him.

he must navigate to complete the Program. Accordingly, I find that the mootness doctrine is not implicated under these facts.

Notwithstanding, the threshold issue regarding Plaintiff's due process claims is whether he has a liberty interest in avoiding the conditions of confinement at ADX. At the time of the Complaint's filing, Plaintiff was incarcerated in the general population unit and had been so held for nearly thirteen years. However, at the time of the Motion's filing, Plaintiff had been transferred to a marginally less-restrictive unit referred to as the J Unit. Moreover, at the time of the Supplement's filing, Plaintiff had been transferred to an even less-restrictive unit referred to as the K Unit. The length of his stay in the K Unit is unknown. Indeed, Plaintiff may have already been transferred to a different unit which has even less-restrictive conditions than those of the K Unit. Because Plaintiff's conditions of confinement appear to be a moving target, and because I find that if the conditions in the general population unit do not implicate a liberty interest, the conditions in less-restrictive units must similarly fail,[5] the appropriate analysis is whether Plaintiff has a liberty interest in avoiding incarceration in the general population unit at ADX. Further, because I have found that Plaintiff's admission to the Step-Down Unit Program does not moot his claim given the possibility that he could be returned to the general population unit, his current conditions of confinement at ADX are arguably irrelevant. I note that the parties have briefed the conditions of confinement both as to the general population unit and J Unit.

---

[5] For example, comparing the general population unit and J Unit, I find that the overall conditions in the general population unit are more extreme than those of the J Unit. From the briefing, it is unclear whether Plaintiff would dispute this conclusion. Nevertheless, if he did so, I would find that his dispute was not supported by the weight of the evidence and subject to rejection. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Accordingly, I am able to resolve the threshold issue on the current pleadings by considering whether the general population unit conditions implicate a liberty interest.

## D. Liberty Interest

Despite the parties' prolix and voluminous briefing on Plaintiff's due process claims, the legal analysis mandated here is simple. If there is no material dispute that as a matter of law, Plaintiff has no liberty interest in avoiding the conditions of confinement in the general population unit at ADX, the analysis ends. In those circumstances, the parties' hotly contested evidence regarding the process provided to Plaintiff need not be considered. Although the Court previously found that Plaintiff stated a plausible liberty interest in avoiding the conditions of confinement in the general population unit at ADX, *Recommendation* [#57] at 10-19, Defendants argue that his claims nevertheless fail on summary judgment. *Motion* [#112] at ; *Supplement* [#147] at 5-7. After careful review of the parties' evidence and applicable case law, I agree. My Recommendation is explained in detail below.

Liberty interests "are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," *Shaw v. Murphy*, 532 U.S. 223, 228 (2001), this reality is tempered by the recognition that "[t]here is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974). In considering whether Plaintiff's

allegations trigger a liberty interest, I must examine the conditions of confinement before I determine whether such conditions impose an atypical and significant hardship on the inmate. *See Fogle v. Pierson*, 435 F.3d 1252, 1259 (10th Cir. 2006) (citing *Gaines v. Stenseng*, 292 F.3d 1222, 1225-26) (10th Cir. 2002)).

The Supreme Court addressed the issue of restrictive prison conditions in *Wilkinson v. Austin*, 545 U.S. 209 (2005). Specifically, the Court considered whether prisoners were deprived of a liberty interest by their placement in Ohio's super maximum prison and whether they were provided sufficient process regarding that placement. *Id.* at 213. The Court considered the totality of the conditions at the super maximum prison in determining whether confinement there imposed an atypical and significant hardship. *Id.* at 214-15. Many of the conditions at issue in *Wilkinson* are similar to those complained of here, namely (1) prohibition of human contact; (2) confinement to a small cell for as many as twenty-four hours per day, with one hour allotted for exercise on certain days, but not every day; and (3) undefined length of incarceration in the most-restrictive conditions with limited review regarding the continued propriety of placement. Also present in *Wilkinson*, but not pled here, was the fact that the lights were left on twenty-four hours a day in each cell and that placement at the super maximum prison disqualified a prisoner for parole. *Id.* Given the totality of these conditions, the Court found that confinement at the super maximum prison constituted an atypical and significant hardship such that a prisoner's incarceration there was subject to due process protections. *Id.* at 220-24.

As noted above, Defendants contend that Plaintiff's conditions at ADX do not implicate a liberty interest. As Defendants correctly note, mere placement in a unit with restrictive conditions does not, on its own, implicate a liberty interest. *See Talley v. Hesse*,

91 F.3d 1411, 1413 (10th Cir. 1996); *Templeman*, 16 F.3d at 369. A determination of what constitutes an atypical and significant hardship necessarily includes a consideration of whether the conditions in question are a dramatic departure from what would ordinarily be expected. This consideration includes whether the conditions complained of (1) further a legitimate penological interest; (2) are extreme; (3) inevitably increase the duration of a prisoner's sentence; and (4) are for an indefinite term. *Sandin*, 515 U.S. at 484-87; *Estate of DiMarco v. Wyo. Dep't of Corr., Div. of Prisons*, 473 F.3d 1334, 1342 (10th Cir. 2007) (hereinafter, the "*DiMarco* factors"). This "assessment must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts." *DiMarco*, 473 F.3d at 1342 (citation omitted).

As a preliminary matter, it must be noted that to date no court in the Tenth Circuit has held that the conditions at ADX, regardless of unit, implicate a liberty interest. In fact, both courts that have addressed ADX conditions on summary judgment have unanimously found that such conditions were not atypically restrictive. *Jordan v. BOP*, 191 Fed. Appx. 639, 653 (10th Cir. 2006) (unpublished decision) (control unit); *Georgacarakos v. Wiley*, No. 07-cv-01712, 2010 WL 1291833, at *11-13 (D. Colo. Mar. 30, 2010) (unpublished decision) (general population unit); *see also Muhammed v. Hood*, 100 Fed. Appx. 782, 783 (10th Cir. 2004) (unpublished decision) (upholding dismissal of ADX inmate's habeas due process claim because his conditions in the general population unit, while restrictive, did not amount to an atypical or significant hardship). Similarly, courts which have addressed analogous confinement in units with restrictive conditions have likewise found that they did not rise to the level of those at issue in *Wilkinson. See e.g.*, *DiMarco*, 473 F.3d at 1342-44 (holding that fourteen-month segregation for safety reasons did not implicate a liberty interest);

13

*Thompson v. Rios*, No. 07-cv-00025, 2010 WL 749859, at \*7-9 (D. Colo. Mar. 2, 2010) (unpublished decision) (holding that seventeen-month confinement in administrative detention at USP-Florence did not implicate a liberty interest). While these cases are certainly instructive, because I employ a fact-specific consideration of the *DiMarco* factors, they do not necessarily preclude Plaintiff's claims here. *See Thompson v. Winn*, 07-cv-00025, 2008 WL 901570, \*\*6-9 (D. Colo. Mar. 31, 2008) (unpublished decision) (noting that the "determination of whether there is a protected liberty interest is highly fact dependent and requires consideration of a number of nonexclusive factors, viewed in their totality").

### 1. Legitimate Penological Interest

The Court first considers whether Defendants have a legitimate interest in placing Plaintiff at ADX. As a preliminary matter, "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt*, 459 U.S. at 468; *see also Meachum v. Fano*, 427 U.S. 215, 228 (1976) (noting that "[w]hatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections so long as prison officials have discretion to transfer him for whatever reason or for no reason at all").

The mission of ADX, as set forth in the Inmate Security Designation and Custody Classification Manual [Docket No. 112-5 at 29], is to house "inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution."[6] Defendants contend

---

[6] To be clear, although Plaintiff contends that this mission limits the type of inmates who can be housed at ADX to those who have committed misconduct after incarceration, see

that given Plaintiff's military skills – including his training in weapons making and hand-to-hand combat – as well as his membership in terrorist organizations and conviction for air piracy, "confinement of an inmate like [Plaintiff] at ADX obviously is related to a legitimate penological interest in safety." *Motion* [#112] at 35; *see Plaintiff's Deposition* [#112-1] at 11-37. Plaintiff does not dispute that he has military training, but argues that it is "not nearly as extensive as Defendants portray." *Response* [#123] at 31; *Plaintiff's Declaration* [#123-3] at 3.

In contrast, Plaintiff contends that Defendants' proposed penological interest must be determined in the context of how a prisoner has behaved while in prison. To this end, Plaintiff argues that because he has had an exemplary conduct history while incarcerated, his placement at ADX cannot reasonably be justified by safety concerns. *See Response* [#123] at 29-31; *Plaintiff's Declaration* [#123-3] at 2-3. However, Plaintiff overlooks the fact that determinations regarding safety may reasonably be based on factors other than an inmate's disciplinary record. Moreover, Plaintiff provides no compelling legal support for his suggested limitation on the type of information that BOP can consider before it transfers

_____

*Response* [#123] at 29, I do not read the mission statement so narrowly. The use of the word "demonstrated" is unfortunate, as it arguably implies some record of less-restrictive incarceration prior to assignment to ADX. However, the record in this case makes clear that the manual is not so construed by BOP. *See generally Mason's Declaration* [#112-5] at 2-3 (noting that some inmates at ADX are designated directly upon sentencing). Considering that an inmate can be designated to ADX at the outset of his sentence, it cannot be reasonably argued that an inmate's conviction and background alone could not provide a basis for his placement there. Deference to an agency's interpretation of its own manual is appropriate "given the specialized experience and broader . . . information available to the agency." *Wilson v. Kastner*, No. 09-6060, 2010 WL 2696829, at *5 (10th Cir. July 8, 2010) (unpublished decision) (citing *Skidmore v. Swift Co.*, 323 U.S. 134, 140 (1944); *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001)); *see also Reno v. Koray*, 515 U.S. 50, 61 (1995) (noting that agency's interpretation of its policies is persuasive and entitled to "some deference"). Further, requiring BOP officials to wait until the inmate acts out before being permitted to transfer him to a more-restrictive facility would unnecessarily constrain the penological judgment of such officials.

an inmate to a facility with restrictive conditions.[7]   Further, to the extent that Plaintiff

contends that because he has never created a safety issue while incarcerated a material

dispute exists as to Defendants' legitimate penological interest, I disagree.  Defendants

have a legitimate penological interest in protecting the safety of inmates and staff in the

present and the future, not just in the past.  While past good conduct is relevant, see *Fox's

Deposition* [#123-7] at 50, 87, it is not a guarantor of future good conduct, and does not

neutralize Defendants' legitimate ongoing penological interest in promoting the safety of

inmates and staff.  Even crediting Plaintiff's contention that his military skills are not as

advanced as claimed by Defendants, Plaintiff's conviction, training (such as it is), and prior

military/terrorist group membership raise legitimate safety issues which are properly

considered by BOP in determining whether he warrants restrictive placement.

Further, I reject Plaintiff's contention that "the reason that Mr. Rezaq was transferred

to ADX in 1997 . . . remains in dispute" merely because Defendants cannot "prove" that the

reasons which have been provided by them are accurate and complete.  *See Supplemental

Response* [#148] at 13-14.   First, Plaintiff is mistaken that Defendants lack evidence

regarding the information considered by BOP in 1997 when the decision was made to

transfer Plaintiff to ADX.  Defendants provided a December 19, 1996 memorandum written

---

[7] While I noted in resolution of the Motion to Dismiss that, assuming the allegations of
the Complaint were true, it appeared Defendants had arbitrarily transferred Plaintiff to ADX
given that BOP officials did not assign him there upon sentencing, the development of the
factual record has revealed that while Plaintiff was initially placed at USP-Leavenworth, the
decision to transfer him to ADX was made within a two-month time period thereafter based on
the recommendation of that facility's warden given Plaintiff's conviction, training and background
[Docket No.112-2 at 49-50].  Further, I note that Plaintiff's later placement at ADX was not
inconsistent with his earlier placement at USP-Leavenworth, given that he was not placed in the
general population unit at USP-Leavenworth and, rather, had been incarcerated in both
administrative detention and the special housing unit during his brief time there.  *Collins'
Declaration* [#112-2] at 3.

by the warden at USP-Leavenworth stating that because of Plaintiff's conviction and background, particularly in weapons training and bomb making, he felt that it was appropriate to transfer Plaintiff to ADX [Docket No. 112-2 at 49-50]. Second, I find that as long as Defendants have provided a reasonable basis for transferring Plaintiff to ADX, i.e., safety, their reliance on the warden's contemporaneous memorandum is not alone determinative of whether they had a legitimate penological interest in transferring Plaintiff to ADX. As noted above, safety is a reasonable justification for an inmate's placement at ADX and, given Plaintiff's criminal history and military/terrorist group background, that safety concern may be properly addressed by restricting his movement while in prison. Plaintiff's assertion is only material if the justifications used by Defendants do not speak to his particular background and history. Here, however, Defendants' justifications (whether relied on at the time of transfer or thereafter) clearly address the goal of safety.

Finally, I reject Plaintiff's contention that because other convicted terrorists or individuals with similar backgrounds are not assigned to ADX, the reasonableness of Defendants' decision to place Plaintiff at ADX is questionable. *See Response* [#123] at 32. My review here is limited to whether Plaintiff's placement passes constitutional muster. There may be many unknown reasons why certain inmates have been classified differently from Plaintiff, and I will not speculate as to those reasons. It is not my role to second-guess BOP's decisions further. *See Sandin*, 515 U.S. at 482-83 (noting that courts should give deference to the decisions related to safety made by federal prison officials). Therefore, I find that this argument does not raise a dispute about a material issue of fact.[8]

_____

[8] Further, Plaintiff's "belief" that the warden's request to transfer him to ADX was racially motivated, *see Response* [#123] at 15; *Plaintiff's Declaration* [#123-3] at 2, as discussed at

Accordingly, this factor weighs against finding that Plaintiff's confinement in the general population unit at ADX implicated a liberty interest.

## 2.    Nature of Conditions[9]

As noted above, there is some similarity between the conditions experienced by Plaintiff and those at issue in *Wilkinson*.  There are also key differences.  For example, ADX inmates have control over the lights in their cell.  *See Collins' Declaration* [#112-2] at 11 (noting that "inmate controls the setting of the lights from inside his cell" and is only required to turn them "on when staff are interacting with him").  By contrast, inmates in *Wilkinson* did not; the lights remained on twenty-four hours a day, and inmates who attempted to shield themselves from the light were subject to discipline.  *Wilkinson*, 545 U.S. at 214, 224.  ADX inmates have some opportunity for outdoor exercise, although Plaintiff disputes whether outdoor exercise is provided on a regular basis.  *See Response* [#123] at 22; *Plaintiff's Declaration* [#123-3] at 4.  By contrast, inmates in *Wilkinson* did not have any opportunity for outdoor exercise and only recreated in a small indoor room.  *Wilkinson*, 545 U.S. at 214, 224.  ADX inmates have regular contact with staff, although Plaintiff disputes whether the frequency and quality of this contact is sufficient.  *Plaintiff's Declaration* [#123-3] at 6; [#148-10] at 4-6.  By contrast, inmates in *Wilkinson* had almost no human contact.  *Wilkinson*, 545 U.S. at 214, 224.  ADX inmates have a cell door window

---

length below, is not competent summary judgment evidence and is, therefore, insufficient to raise a factual dispute.

[9] To the extent that Plaintiff attempts to create a factual dispute by citation to statements made by undisclosed witnesses and experts or contained in undisclosed or unauthenticated documents, this evidence is inadmissible and, therefore, not competent summary judgment evidence.  Fed. R. Civ. P. 56(e)(1); *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

and can, on occasion, converse with one another. *See Plaintiff's Declaration* [#123-3] at 4; [#148-10] at 3 (admitting that conversation can occur, but qualifying that conversations are limited to inmates on either side of Plaintiff's cell). By contrast, the cell doors in *Wilkinson* were solid and allowed no opportunity for inmate communication. *Wilkinson*, 545 U.S. at 214. ADX inmates may receive up to two fifteen-minute social visits per month. *Collins' Declaration* [#112-2] at 9. By contrast, inmates in *Wilkinson* were rarely provided opportunities for social visits. *Wilkinson*, 545 U.S. at 214.

Simply, the conditions complained of by Plaintiff, even considering all of his "disputed" or "partially disputed" facts as true, did not deprive Plaintiff of "access to the basic essentials of life." *See DiMarco*, 473 F.3d at 1343. This fact was crucial to the court in *DiMarco* which noted that, while the conditions of the inmate were "admittedly Spartan," she still had clean clothing, personal hygiene materials, out-of-cell time, access to prison programs, and ate the same meals as the rest of the prison population. *Id.* Plaintiff likewise was not deprived of these basic necessities. While he may take issue with the amount of time he was provided outside his cell each week, the opportunity for out-of-cell recreation was available to him throughout the duration of his incarceration in the general population unit. Further, in relation to Plaintiff's access to prison programs while in the general population unit, I note that Plaintiff was given access to and took advantage of an expansive list of Adult Education Courses, including Beginning Algebra, History of WWI, Economics USA, Calculus Made Clear, World Religion, Islam/Christianity, History of Ancient Egypt I and II, Famous Authors, Natural Law and Human Nature, and Physics in Your Life, to name only a few [Docket No. 112-3 at 10-11]. In addition, Plaintiff received several work assignments to serve as an orderly during at least six different time periods

19

from 2001 to the present [Docket No. 112-3 at 10].   An orderly is tasked with the responsibility of cleaning the area outside the cells in the range where the inmate is assigned.  *See Plaintiff's Declaration* [#148-10] at 6.

Although Plaintiff proposes that the Court create a baseline approach for determining whether his conditions of confinement are extreme by considering the conditions of other similarly-situated inmates, Plaintiff has failed to provide legal support for this proposition.  *See Response* [#123] at 37 & n.8.   The Court is obligated to follow the law, and the *DiMarco* factors provide the appropriate test in these circumstances.   That test does not include a requirement that the Court compare an inmate's conditions to those experienced by inmates with similar backgrounds or classifications.[10]   *See generally DiMarco*, 473 F.3d at 1342.

Finally, to the extent that Plaintiff contends that his conditions of confinement at ADX are atypical because his family lives in Jordan and the time difference, distance and expense make meaningful interaction with his family difficult, see *Plaintiff's Declaration* [#148-10] at 6, such difficulties are a necessary part of his confinement in any penal institution in the United States.  Further, although likely accurate, Plaintiff's contention that

---

[10] If any comparison is instructive, it may be a comparison of whether the conditions complained of by Plaintiff differ significantly from those experienced by inmates serving time in the general population at a typical BOP prison.  *See, e.g.*, *DiMarco*, 473 F.3d at 1343 (comparing inmate's conditions in segregation to those of inmates in general population in state prison).  From the limited briefing on this issue, it does not appear that the parties would dispute that the conditions in the general population unit at ADX are harsher than those experienced by prisoners in a typical general population unit of a federal prison.  Nevertheless, the Tenth Circuit recognized that despite differences resulting in one inmate's conditions being more-restrictive than another's, "[t]he prison has no constitutional duty to equalize [amenities] in every detail. Nor does a prisoner have a right to access every type of program available to other inmates, ranging from work to recreation."  *DiMarco*, 473 F.3d at 1343.  Therefore, such differences alone do not make the conditions atypical.

it is unfair to ask his family to travel long distances to visit him because "it will be painful for them to see [him] and not even be able to have any physical contact during [the] visit" is equally unavailing here. *See id.* Quite simply, these restrictions and difficulties are a part of the penalty Plaintiff must pay for his crime and are certainly not atypical of the ordinary limitations Plaintiff would experience in interacting with his family were he incarcerated elsewhere in the United States. *See Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (recognizing that "freedom of association is among the rights least compatible with incarceration . . . [such that] curtailment of that freedom must be expected in the prison context" (citation omitted)). More specifically, the inability to have physical contact during visits is not unique to ADX. *See, e.g.*, *id.* at 134 (noting that ban on noncontact visits was rationally related to legitimate penological interest); *Henry v. Dep't of Corr.*, 131 Fed. Appx. 847, 849-50 (3d Cir. 2005) (unpublished decision) (holding that permanent ban on contact visits was not cruel and unusual punishment).

I find that Plaintiff's conditions of confinement in the general population unit at ADX do not rise to the level of those at issue in *Wilkinson*. This holding is supported by the conclusions reached by the courts in *Jordan* and *Georgacarakos*. These cases "aptly demonstrate that restrictions such as those at ADX, while harsh, are not so shocking to the conscience that they can be deemed to be 'atypical and significant' of their own accord." *Georgacarakos*, 2010 WL 1291833, at *13. Moreover, it cannot reasonably be disputed that the inmate's conditions in *Jordan* were more restrictive than those at issue in the general population unit at ADX.[11] In that case, comparing the inmate's conditions to those

---

[11] For example, the inmate in *Jordan* did not have unlimited access to television and radio. *Jordan*, 191 Fed. Appx. at 649-52 (holding that, regardless, inmate's conditions were not

of the general population at ADX, the Tenth Circuit found that they were not atypical. *Jordan*, 191 Fed. Appx. at 651-52. Although Plaintiff suggests that the length of time he has spent in the general population unit (almost thirteen years) raises a dispute about whether his conditions are atypical, I disagree. While Plaintiff endured the conditions longer than the inmates in *Jordan* (five years) and *Georgacarakos* (seven years and ongoing),[12] there is nothing about a thirteen-year confinement that would not also be significant about a five or seven-plus year confinement. Under any benchmark, all are particularly long periods of time. Further, while the length of time is instructive, it does not impact the fact that the conditions at issue here are simply not as restrictive as those at issue in *Wilkinson*.[13] In particular, as recognized by the Tenth Circuit in *Jordan*, an inmate's

---

as onerous as those at issue in *Wilkinson*). Here, there is no dispute that Plaintiff can watch television twenty-four hours per day in his cell and can access sixty broadcast channels and other closed-circuit programming including radio stations. *Collins' Declaration* [#112-2] at 11.

[12] *See Georgacarakos v. Wiley*, No. 07-cv-01712, 2008 WL 4216265, at *1 (D. Colo. Sept. 12, 2008) (unpublished decision) (noting that inmate assigned to ADX general population unit since March 2003).

[13] Plaintiff cites two cases from this Circuit for the proposition that incarceration in segregation for long periods of time may constitute an atypical confinement. *See Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006) (reviewing dismissal prior to development of evidence); *Toevs. v. Reid*, No. 06-cv-01620, 2009 WL 598258, at *8 (D. Colo. Mar. 6, 2009) (unpublished decision). *Trujillo* is not instructive because it involved an analysis of whether the inmate's claims could be summarily dismissed as frivolous. The court did not reach a decision on the merits. Likewise, *Toevs* is distinguishable because it involved an analysis of whether the due process claim could survive a motion to dismiss. In addition, in that case it appears that the inmate was placed in punitive segregation. Here, the evidence reveals that Plaintiff's incarceration at ADX was (1) not segregation in the technical sense and (2) not a punishment for unacceptable behavior while in prison, but rather a safety measure given Plaintiff's background and conviction. In such a case, I find that the length of time of restrictive confinement becomes less important because it must yield to BOP's legitimate penological interest. *See generally Hewitt*, 459 U.S. at 468 (recognizing that prison officials have discretion to transfer inmates to more-restrictive confinement for nondisciplinary reasons without necessarily implicating constitutional protections); *Lee v. Huggins*, No. 8:08-cv-1594, 2008 WL 2690101, at *3 & n.1 (D.S.C. July 1, 2008) (recognizing that *Hewitt* remains good law on this significant point).

opportunity for interaction is a key distinction.  *See id.* at 652.  Here, it cannot be disputed that as in *Jordan*, Plaintiff has opportunities to interact with staff.  *Compare Plaintiff's Declaration* [#123-3] at 6; [#148-10] at 4-6, *with Collins' Declaration* [#112-2] at 11-12.  In addition, and even more so than in *Jordan*, Plaintiff has the opportunity to converse with inmates on either side of his cell and during out-of-cell recreation time.  *Plaintiff's Declaration* [#123-3] at 4; [#148-10] at 3; *Collins' Declaration* [#112-2] at 8-9.

Accordingly, this factor weighs against finding that Plaintiff's confinement in the general population unit at ADX implicated a liberty interest.

### 3.      Eligibility for Parole

Whether the inmate's sentence is prolonged by his restrictive placement was a key consideration to the Court in *Wilkinson*.  *See Wilkinson*, 545 U.S. at 223-24 (noting that parole disqualification elevated restrictive conditions beyond those ordinarily experienced by prisoners in solitary confinement to those giving rise to constitutional protection).  Here, there is no dispute that Plaintiff's incarceration in the general population unit at ADX does not disqualify him from parole consideration.[14]  *See, e.g.*, *Mason's Declaration* [#112-5] at

---

[14] To the extent that Plaintiff contends in his Supplemental Response that "Defendants have not affirmatively demonstrated that ADX does not affect parole or extra good time," he misperceives the burden here.  *See Supplemental Response* [#148] at 19 n.3.  In his Response to Defendants' Motion, Plaintiff did not provide any competent evidence to dispute Defendants' well-supported contention that Plaintiff's placement at ADX does not disqualify him for parole.  *See Response* [#123] at 40 (choosing instead to argue that this factor should not be given significant weight in the analysis).  This fact is significant because the burden of proof shifted to Plaintiff after Defendants established the absence of evidence in Plaintiff's favor.  Therefore, it was incumbent upon Plaintiff to provide competent evidence to create a material dispute.  Plaintiff's mere assertion that there "have been some indications that a prisoner's placement in a high security prison . . . can impact their [sic] ability to be granted parole," and his citation to a complaint filed in another District, see *Supplemental Response* [#148] at 19 n.3, are insufficient to raise a dispute.  *See generally Bones*, 366 F.3d at 875.

3.  As such, this crucial factor weighs against finding that Plaintiff's confinement implicates a liberty interest.  Nevertheless, Plaintiff argues that "[d]istrict courts consistently find that this factor is not dispositive and it has not weighed heavily against ADX inmates in particular."  *Response* [#123] at 40.  Second, Plaintiff "maintains that his wrongful confinement to, and restriction at, the ADX has stigmatized him at his parole hearings, and may well be a factor in the parole committee's decision-making process."  *Id.*

Considering each argument raised by Plaintiff separately, to the extent that Plaintiff contends that this factor is relaxed for ADX inmates, his only legal support for this conclusion is an analysis of motions to dismiss where the courts assumed the allegations in the complaint were true, construed any ambiguity in the plaintiffs' favor and considered only whether the plaintiffs' claims were plausible.  That same deferential standard does not apply in resolution of the present Motion and Supplement.  While Plaintiff was entitled to an assumption of the truth of his allegations in support of his claims on resolution of the Motion to Dismiss, he has a greater burden here.  Further, Plaintiff's legal argument unsuccessfully attempts to downplay the importance of this factor.  In addition, legal argument is not competent summary judgment evidence.  The Court is obliged to give each factor the appropriate weight and to disregard or discount none.

Second, to the extent that Plaintiff expresses his belief that his placement at ADX has worked against him at his parole hearings, Plaintiff's "belief" is not competent summary judgment evidence.  *See BancOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1101 (10th Cir. 1999) ("While an affidavit is certainly an appropriate vehicle to establish a fact for summary judgment purposes, the affidavit must set forth *facts*, not conclusory statements." (emphasis added)); *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422

(10th Cir. 1995) (holding that because plaintiffs' affidavits were "merely conclusory and [did] not provide any factual bases for [plaintiffs] inference," the claim could not survive summary judgment). A plaintiff's "conclusory and self-serving statements, even if presented in an affidavit, are insufficient to create a genuine issue of fact to survive summary judgment." *Thomas v. BOP*, No. 07-1426, 2008 WL 2498049, at *3 (10th Cir. June 24, 2008) (unpublished decision); *see also Wallin v. Dycus*, No. 03-cv-00174, 2009 WL 2490127, at *5 (D. Colo. Aug 13, 2009) (unpublished decision) (noting that a plaintiff "cannot defeat a motion for summary judgment by standing on his own unsupported, self-serving allegations").

Accordingly, this factor weighs against finding that Plaintiff's confinement in the general population unit at ADX implicated a liberty interest.

### 4. Indeterminate Status

Finally, considering the fourth factor enunciated in *DiMarco*, namely whether the placement is indeterminate, the fact that the inmate received regular opportunities for review of her placement was a significant factor to the Court in *DiMarco*. *See DiMarco*, 473 F.3d at 1343-44 ; *see also Wilkinson*, 545 U.S. at 224 (noting that indefinite placement elevated isolating conditions beyond those ordinarily experienced by inmates in solitary confinement). Here, Defendants aver that it is undisputed that Plaintiff's status is reviewed on a periodic basis through three means: (1) classification review, (2) program review, and (3) custody classification review [Docket Nos. 112-2 at 52-56 & 112-3 at 1-12]. *Motion* [#112] at 41-43; *Collins' Declaration* [#112-2] at 3-7. For example, Defendants note that Plaintiff has had twenty-eight program reviews since his transfer to ADX. *Motion* [#112] at 42. Moreover, I note that there is no dispute that Plaintiff receives a review and an

opportunity to discuss his status with his Unit Team approximately every six months. *See Plaintiff's Declaration* [#123-3] at 7. Although Plaintiff contends that these reviews are meaningless, he does not dispute that they occurred and that he had some opportunity to participate. *Response* [#123] at 13, 41; *Plaintiff's Declaration* [#123-3] at 7.

Further, I note that the existence of the Step-Down Unit Program was a key consideration to the court in *Georgacarakos*. *See Georgacarakos*, 2010 WL 1291833, at *13. There, the court noted that because the inmate "can obtain a transfer out of ADX upon completing the 'step down program,' . . . one can hardly call his assignment there 'indefinite.'" *Id.* Although I credited Plaintiff's contention at the Motion to Dismiss stage that he was being unreasonably denied admission to the Program on the basis of circumstances that he could not mitigate, *Recommendation* [#57] at 18-19, those facts have now changed. Further, the development of the record reveals evidence that ADX officials were not arbitrarily denying Plaintiff admission but, rather, were acting out of concern that his background and training, including other concerns about behavior at ADX, required a cautious approach to transferring Plaintiff to a less-secure unit despite his otherwise clear conduct record [Docket Nos. 112-3 at 10; 147-1]. *See, e.g.*, *Fox's Deposition* [#123-7] at 91-96, 115, 118-20, 127-36; [#112-6] at 6-7, 9-10. The decisions of BOP officials, including the decision to delay and the decision to ultimately place Plaintiff in the Program, are entitled to deference. *See DiMarco*, 473 F.3d at 1342.

Here, I find that the undisputed fact that Plaintiff was not admitted into the Step-Down Unit Program for almost thirteen years after his incarceration at ADX does not make his incarceration there indefinite. *See, e.g.*, *Jordan*, 191 Fed. Appx. at 652 (holding that five-year incarceration in control unit at ADX and USP-Florence was not indefinite because

it was tied to murder investigation); *Geogacarakos*, 2010 WL 1291833, at *13 (holding that ongoing incarceration in general population unit at ADX was not indefinite given the existence of the Step-Down Unit Program). Comparing the present case to *Jordan*, I note that the inmate there did not appear to have access to the Step-Down Unit Program. Rather, his incarceration in the control unit at ADX was tied to the length of an investigation involving the murder of a fellow inmate. Despite the fact that the Tenth Circuit was concerned about the length of time the investigation took, because the segregation was tied to an investigation which had a finite ending and was related to a legitimate safety interest, the Court concluded that the inmate's incarceration was not indefinite. *Jordan*, 191 Fed. Appx. at 652-53. Arguably, the existence of the Step-Down Unit Program and the procedures employed to allow an inmate to advance through its levels provides a far more definite benchmark than an ongoing investigation, regardless that Plaintiff's admission to the Program ultimately took longer than the investigation in *Jordan*. Although Defendants arguably could have admitted Plaintiff to the Program long before they did, this option was never foreclosed to Plaintiff and, indeed, he is now quickly moving through its ranks.

Accordingly, this factor weighs against finding that Plaintiff's confinement in the general population unit at ADX implicated a liberty interest.

### E.     Summary of *DiMarco* Factors

Regardless of the existence of immaterial factual disputes, analyzing Plaintiff's actual conditions in the context of the *DiMarco* factors leads to the conclusion that a liberty interest is not implicated here. I find that the facts critical to the analysis are not in dispute. Even crediting Plaintiff's hard-fought effort to liken his conditions to those at issue in

*Wilkinson*, the balance of the other factors does not weigh in Plaintiff's favor.[15] This is particularly true given that Plaintiff's incarceration at ADX is neither technically indefinite nor does it impact the length of his sentence. The Court is persuaded that the existence of some conditions analogous to those at issue in *Wilkinson* does not render a prisoner's confinement atypical unless other factors like the deprivation of parole consideration and indeterminate length of placement are also present. In the context of litigation involving nondisciplinary restrictive placements, the circumstances of confinement must create a virtual dead end for the prisoner in order for due process guarantees to become operative. Here, Plaintiff has exit routes, albeit challenging ones.

The Court in *Wilkinson* appears to make this point when it noted that "any of these conditions standing alone might not be sufficient to create a liberty interest," and that, rather, the combination of factors shifted the balance in favor of the inmate. *See Wilkinson*, 545 U.S. at 224. Moreover, specifically in relation to ADX conditions, the Tenth Circuit noted that the inmate's restrictive conditions, on their own, were not sufficiently atypical to implicate a liberty interest. *Jordan*, 191 Fed. Appx. at 652. Finally, the Seventh Circuit has interpreted *Wilkinson* to mean that "absent indefinite placement and disqualification from parole," the solitary conditions of confinement in *Wilkinson* do not deviate from the "ordinary incidents of prison life that inmates have no liberty interests in avoiding." *Townsend v. Fuchs*, 522 F.3d 765, 772 (7th Cir. 2008) (refusing to reconsider "established position that inmates have no liberty interest in avoiding placement in discretionary segregation").

---

[15] To be clear, the evidence does not support Plaintiff's contention that his conditions are as restrictive as those at issue in *Wilkinson*. Nevertheless, even if they were, the balance of the other *DiMarco* factors would not prompt a reasonable juror to find that Plaintiff's incarceration in the general population unit at ADX implicates a liberty interest.

Given that I find that Plaintiff has failed to raise a genuine dispute that his incarceration at ADX implicates a liberty interest, there is no need to consider whether Plaintiff has been provided with sufficient due process protections. *Templeman*, 16 F.3d at 369. Accordingly, I recommend that Defendants' Motion and Supplement be **granted**.

### IV. Conclusion

For the reasons stated above, the Court RECOMMENDS that Defendants' Motion [#112] and Supplement [#147] be **GRANTED** and that summary judgment be entered in favor of Defendants.

IT IS FURTHER **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. A party's failure to serve and file specific, written objections waives *de novo* review of the Recommendation by the district judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996). A party's objections to this Recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated: August 17, 2010

BY THE COURT:
 s/ Kristen L. Mix
U.S. Magistrate Judge
Kristen L. Mix